[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Nicholas*, Slip Opinion No. 2022-Ohio-4276.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4276

THE STATE OF OHIO, APPELLEE, *v*. NICHOLAS, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Nicholas*, Slip Opinion No. 2022-Ohio-4276.]

*Juvenile procedure—R.C. 2152.12(B)—Discretionary transfer of a juvenile for prosecution in an adult court—R.C. 2152.12(B) by its terms establishes a preponderance-of-the-evidence standard for deciding a juvenile's amenability—R.C. 2152.12(C)—Amenability hearings—Facts presented to a juvenile court with respect to a discretionary transfer must persuade the court that the juvenile is not amenable to care or rehabilitation in the juvenile system—State need not produce affirmative evidence of nonamenability—Juvenile court need not consider all potential juvenile dispositions, including a serious-youthful-offender disposition, when balancing the factors weighing in favor of and against discretionary transfer.*

(No. 2020-1429—Submitted December 7, 2021—Decided December 2, 2022.)

APPEAL from the Court of Appeals for Champaign County,

No. 2018-CA-25, 2020-Ohio-3478.

---

**O'CONNOR, C.J.**

{¶ 1} After the Champaign County Court of Common Pleas, Juvenile Division, transferred jurisdiction over appellant, Donovan Nicholas, to that court's general division, a jury found Nicholas guilty of aggravated murder and murder, both with firearm specifications, for the killing of his father's live-in girlfriend when he was 14 years old. In his direct appeal, Nicholas argued that the juvenile court abused its discretion and violated his constitutional right to due process by transferring his case to the adult court, but the court of appeals rejected that argument and affirmed Nicholas's convictions. 2020-Ohio-3478, 155 N.E.3d 304, ¶ 5.[1]

{¶ 2} The legal issues presented in this appeal concern the standards and procedures that apply to a juvenile court's discretionary transfer of a juvenile for prosecution in an adult court. We specifically consider the questions of which party bears the burden of proof, what is the applicable standard of proof, and whether the juvenile court must consider all juvenile dispositional options, including a serious-youthful-offender disposition, in determining whether a juvenile is amenable to care or rehabilitation in the juvenile system. After answering those questions, we consider the juvenile court's application of the relevant standards to the facts of this case.

## I. Relevant Background

### A. Discretionary transfer under R.C. 2152.12(B)

{¶ 3} Ohio's juvenile justice system provides for two types of transfer: discretionary and mandatory. *State v. Hanning*, 89 Ohio St.3d 86, 90, 728 N.E.2d

---

1. The court of appeals reversed a portion of the trial court's judgment related to the award of fees, and it remanded the matter with instructions for the trial court to remove appointed-counsel fees from the cost bill and to clarify two other categories of assessed fees.

1059 (2000). As its name implies, discretionary transfer affords juvenile-court judges the discretion to transfer to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or who appear to be a threat to public safety. *Id.*; R.C. 2152.12(B). Mandatory transfer, on the other hand, removes discretion from judges and requires the transfer of a juvenile to adult court in certain situations. *Id.*; R.C. 2152.12(A). This case concerns discretionary transfer.

{¶ 4} When a complaint has been filed in juvenile court alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court may transfer the child to adult court for prosecution if it finds (1) that the child was at least 14 years old at the time of the charged act, R.C. 2152.12(B)(1), (2) that there is probable cause to believe that the child committed the charged act, R.C. 2152.12(B)(2), and (3) that "[t]he child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions," R.C. 2152.12(B)(3). Before making a discretionary-transfer decision, the juvenile court must order "an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C).

{¶ 5} In determining whether to exercise its discretion to transfer a juvenile to adult court under R.C. 2152.12(B), the juvenile court must balance statutory factors weighing in favor of transfer, which are listed in R.C. 2152.12(D), against statutory factors weighing against transfer, which are listed in R.C. 2152.12(E), and the court must indicate on the record the specific factors it weighed in making its determination, R.C. 2152.12(B)(3). The statutory factors set out in R.C. 2152.12(D) and (E) generally address personal characteristics of the juvenile, the juvenile's history in the juvenile-court system, and the circumstances of and the

harm caused by the acts charged. Some of the statutory factors may be used only to weigh in favor of transfer, *see, e.g.,* R.C. 2152.12(D)(1), or against transfer, *see, e.g.*, R.C. 2152.12(E)(1), while other factors, including the juvenile's emotional, physical, and psychological maturity, *see, e.g.*, R.C. 2152.12(D)(8) and (E)(6), and the time remaining for rehabilitation in the juvenile system, *see, e.g.*, R.C. 2152.12(D)(9) and (E)(8), may be used to weigh either in favor of or against transfer.

### B. Juvenile-court proceedings

{¶ 6} Nicholas was charged with delinquency in the juvenile court for causing the death of Heidi Fay Taylor, his father's live-in girlfriend, whom Nicholas referred to as his mother. A signed statement from a sheriff's detective, Ryan Black, was attached to the juvenile complaints. Detective Black related that a male who identified himself as Donovan Nicholas placed a 9-1-1 call, stating that he had killed his mother. The caller stated that Taylor had been stabbed and shot by "Jeff"—who " 'is inside me.' " Upon responding to the scene, Detective Black and another detective found Nicholas sitting on the kitchen floor, wearing a white, blood-stained t-shirt. Nicholas directed the detectives to Taylor's body, which was in an upstairs bedroom. Nicholas spontaneously told Detective Black that he had "multiple personality disorder," and he later told another detective that a second personality—"Jeff the Killer"—had emerged and was in control at the time of the offenses.

{¶ 7} The state filed a motion to transfer jurisdiction from the juvenile court to the adult court, pursuant to R.C. 2152.10(B) and 2152.12(B). The state argued that Nicholas was not amenable to care or rehabilitation in the juvenile system and that the safety of the community required that he be subject to adult sanctions.

{¶ 8} The juvenile court ordered Daniel Hrinko, Psy.D., to conduct a competency evaluation of Nicholas and appointed a guardian ad litem ("GAL") for Nicholas.

4

**{¶ 9}** At a competency and probable-cause hearing, the parties stipulated to Dr. Hrinko's evaluation attesting to Nicholas's competence, and based on Dr. Hrinko's conclusions, the court declared Nicholas competent to stand trial. After questioning Nicholas and his father about their understanding of Nicholas's rights and their intent to waive a probable-cause hearing, the court found that probable cause existed to believe that Nicholas had committed the acts charged. And based on the parties' stipulation, the court found that Nicholas was 14 years old at the time of the charged acts. Based on those findings, the court found that Nicholas was eligible for discretionary transfer to adult court. In compliance with R.C. 2152.12(C), the court ordered Dr. Hrinko to conduct an amenability evaluation and ordered the GAL to complete a social history and an investigation into Nicholas's family, education, and juvenile-court history.

**{¶ 10}** In his memorandum in opposition to the state's motion to transfer, Nicholas conceded the applicability of several statutory factors weighing in favor of transfer, specifically that the victim suffered physical harm, *see* R.C. 2152.12(D)(1); that his relationship with the victim facilitated the act charged, *see* R.C. 2152.12(D)(3); and that he used a firearm during the commission of the act, *see* R.C. 2152.12(D)(5). But he also noted that he had just turned 15 years old at the time of the amenability hearing, that he measured only 5'3" tall and weighed only 108 pounds, and that he suffered from treatable mental-health conditions. He argued that his extreme youth and treatable mental illness were the most important factors weighing against transfer, and he urged the juvenile court to retain jurisdiction.

**{¶ 11}** At the amenability hearing, the parties stipulated to the admission of certain evidence, including reports submitted by Dr. Hrinko and the GAL. Dr. Hrinko concluded in his report that Nicholas was amenable to treatment within the juvenile system, and the GAL concluded in her report that it was in Nicholas's best interest to remain in juvenile court. The court also heard testimony from witnesses

called by both parties. The state presented testimony from a Champaign County 9-1-1 operator and two detectives from the county sheriff's office, who testified primarily about the charged offenses and, to a lesser extent, about Nicholas's demeanor during their interactions with him. Dr. Hrinko testified on behalf of Nicholas, who also presented testimony from one of his school friends and from Sarah Book, the Acting Chief of Behavioral Health Services at the Ohio Department of Youth Services ("DYS").

{¶ 12} Dr. Hrinko diagnosed Nicholas with dissociative-identity disorder, which involves a disruption of identity characterized by two or more distinct personality states—in this case, "himself" (Nicholas) and "Jeff the Killer." Dr. Hrinko stated in his report that dissociative-identity disorder can be effectively treated in a residential setting, "with a specific focus on eliminating misperceptions about the personalities and themselves and [integrating] the skills possessed by each personality in a manner consistent with the well-being of the individual." At the hearing, he testified that relevant research shows that dissociative-identity disorder can be successfully treated with intensive psychotherapy over a period of several years, with the goal of reintegrating a patient's multiple personalities. Although Dr. Hrinko acknowledged that Nicholas is dangerous while under the control of "Jeff" and that Nicholas would need to be kept in a secure environment with limited access to potential weapons, he opined that Nicholas "is amenable to rehabilitation within the services available within the juvenile justice system."

{¶ 13} Book testified that DYS operates three facilities for juveniles who have been adjudicated delinquent for acts that would be serious felonies. Those facilities are equipped to offer individual and group psychological and psychiatric services to juveniles who are assessed to need them. Each facility has at least one licensed psychologist on staff and contracts with a psychiatrist for onsite services. DYS employs staff "psych assistants" who work under the staff psychologists, as well as other licensed personnel who can perform risk assessments. Book explained

that if a juvenile in DYS custody is assessed to need psychological and psychiatric services, then the juvenile will receive those services. Book, who was aware of Nicholas's diagnosis and was familiar with dissociative-identity disorder in an academic sense, expressed no reservations about DYS's ability to care for and treat Nicholas.

{¶ 14} In its entry regarding amenability, the juvenile court made numerous factual findings, some of which relate to statutory factors weighing in favor of transfer, others of which relate to statutory factors weighing against transfer, and still others that do not specifically relate to any statutory factor. Findings that weighed in favor of transfer included that Taylor suffered physical and psychological harm, that Nicholas's relationship with Taylor facilitated the offense, and that Nicholas used a firearm during the commission of the charged acts. Findings that weighed against transfer included that Nicholas had not previously been adjudicated a delinquent child and that Nicholas "has a mental illness—most likely Dissociative Identity Disorder." The court found that Nicholas appeared to be "highly intelligent," that he presented to the court "with a level of maturity that belies the circumstances of this matter," and that the court could maintain jurisdiction over Nicholas for six years. It did not, however, state whether it weighed those factors as favoring or disfavoring transfer.

{¶ 15} The juvenile court granted the state's motion to transfer Nicholas to adult court. In concluding that the factors favoring transfer outweighed the factors disfavoring transfer, the court stated, "In particular, the Court finds that because [DYS] cannot offer the specific treatment necessary to rehabilitate the juvenile, the juvenile system cannot provide a reasonable assurance of public safety." The crux of the court's decision was its finding that DYS "does not have the resources or capability" to treat dissociative-identity disorder, which requires long-term intensive treatment with 24-hour-a-day and 7-day-a-week supervision and support.

### C. Proceedings in adult court and on appeal

{¶ 16} After the juvenile court transferred Nicholas to adult court, Nicholas was indicted on one count of aggravated murder and one count of murder, both with firearm specifications, and a jury found Nicholas guilty on both counts and specifications.  The trial court merged the offenses and sentenced Nicholas on the aggravated-murder count to life in prison with parole eligibility after 25 full years, plus 3 years of mandatory imprisonment for the second firearm specification.

{¶ 17} As relevant here, Nicholas argued on direct appeal that the juvenile court abused its discretion and violated his right to due process by transferring him to adult court.  He argued that the state failed to present any lay or expert testimony, competing evaluations, or opposing psychological exhibits to overcome a presumption that Nicholas was amenable to treatment and rehabilitation in the juvenile system and that it was unreasonable for the juvenile court not to consider the availability of a serious-youthful-offender disposition as part of its amenability analysis.  In a footnote in his appellate brief, Nicholas also noted that the standard of proof on the issue of nonamenability is unsettled in Ohio.

{¶ 18} Without addressing the applicable standard of proof or burdens that apply in a discretionary-transfer proceeding, the court of appeals held that the juvenile court appropriately considered the relevant statutory factors, that there was "some rational and factual basis in the record to support the court's findings regarding those factors," and that the juvenile court did not abuse its discretion by transferring Nicholas to adult court.  2020-Ohio-3478, 155 N.E.3d 304, at ¶ 73. The court of appeals rejected Nicholas's argument that the juvenile court was required to consider his eligibility for a serious-youthful-offender disposition before determining that he was not amenable to care or rehabilitation within the juvenile system.  *Id*. at ¶ 77.

{¶ 19} Nicholas moved the court of appeals for reconsideration and en banc consideration, both of which the court denied.  The court of appeals rejected

Nicholas's argument that the state has the burden of proof regarding nonamenability, and it stated that "there is no dispute or confusion in Ohio law about the standard of proof or what standards apply to review of amenability decisions," inasmuch as juvenile courts have discretion to determine how much weight should be accorded any given factor under R.C. 2152.12(D) and (E). 2d Dist. Champaign No. 2018-CA-25, 12 (Oct. 8, 2020).

{¶ 20} This court accepted Nicholas's jurisdictional appeal. 161 Ohio St.3d 1439, 2021-Ohio-375, 162 N.E.3d 822.

### D. Propositions of law

{¶ 21} Nicholas sets forth the following three propositions of law:

Proposition of Law I: Because standards of review are functions of due process, non-amenability decisions for discretionary transfer must be supported by clear and convincing evidence.

Proposition of Law II: As the party moving for discretionary transfer under R.C. 2152.12(B), prosecutors typically bear the burden of proving the child is not amenable to juvenile court treatment. A transfer decision without any affirmative proof of non-amenability must be reversed.

Proposition of Law III: To meaningfully decide whether juvenile offenders are not amenable to juvenile court treatment, juvenile judges must first weigh all the available dispositional options, especially, where provided by statute, a serious youthful offender disposition.

## II. Analysis

### A. *Applicable law*

#### 1. *Standard of review*

{¶ 22} This appeal involves application of the discretionary-bindover statute, R.C. 2152.12(B), and consideration of the evidentiary standard and burden of proof that apply in an amenability hearing. An appellate court reviews a juvenile court's determination regarding a juvenile's amenability to rehabilitation or treatment in the juvenile system under an abuse-of-discretion standard. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 14. But beyond the question of amenability, this appeal presents preliminary questions of law that we review de novo. We review de novo questions concerning the meaning of a statute, *State v. Pariag*, 137 Ohio St.3d 81, 2013-Ohio-4010, 998 N.E.2d 401, ¶ 9, determinations of the burden of proof, *Andrew v. Power Marketing Direct, Inc.*, 2012-Ohio-4371, 978 N.E.2d 974, ¶ 46 (10th Dist.), and determinations of which evidentiary standard applies in a given case, *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir.2007).

{¶ 23} With these standards in mind, we now turn to Nicholas's propositions of law.

#### 2. *Burden of proof*

{¶ 24} We first address Nicholas's second proposition of law, which concerns the burden of proof in a discretionary-transfer hearing. Nicholas maintains that the state bears the burden of proving that the juvenile is not amenable to rehabilitation or treatment in the juvenile system and that it must offer affirmative proof of nonamenability to satisfy that burden.

{¶ 25} " '[B]urden of proof' is a composite burden that 'encompasses two different aspects of proof: the burden of going forward with evidence (or burden of production) and the burden of persuasion." *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 163 Ohio St.3d 337, 2020-Ohio-5371, 170 N.E.3d 768, ¶ 20,

quoting *Chari v. Vore*, 91 Ohio St.3d 323, 326, 744 N.E.2d 763 (2001).  The party having the burden of production on a particular issue will lose on that issue as a matter of law if the party does not produce evidence sufficient to make out a case for the trier of fact.  *State v. Robinson*, 47 Ohio St.2d 103, 107, 351 N.E.2d 88 (1976).  The burden of persuasion, on the other hand, "refers to the risk which is borne by a party if the [trier of fact] finds that the evidence is in equilibrium."  *Id.*  "The party with the burden of persuasion will lose if he fails to persuade the trier of fact that the alleged fact is true by such quantum of evidence as the law demands."  *Id.*

{¶ 26} A party who files a motion ordinarily bears the burden of production.  *Cupps v. Toledo*, 172 Ohio St. 536, 539, 179 N.E.2d 70 (1961).  The discretionary-bindover statute, however, presents a unique situation with respect to the burden of production, because it requires the juvenile court itself to "order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation."  R.C. 2152.12(C).  The report of that investigation, which addresses the factors the court must weigh under R.C. 2152.12(D) and (E), is central to an amenability determination.  Of course, the requirement that the juvenile court order an investigation that bears on the question of amenability does not preclude the parties from producing other evidence related to that question, but the court necessarily bases its decision regarding amenability largely on information it gathers for itself.  Thus, it is evident from R.C. 2512.12 that the General Assembly did not intend to preclude discretionary transfer based on the state's failure to produce affirmative evidence of nonamenability.

{¶ 27} Insofar as the "burden of persuasion" refers to the risk borne by a party if the trier of fact finds that the evidence is in equilibrium, *Robinson* at 107, the state bears that burden when it asks the juvenile court to transfer a juvenile's case to adult court.  " 'The burdens of pleading and proof with regard to most facts

have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion.' " *Schaffer v. Weast*, 546 U.S. 49, 56, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), quoting 2 Strong, *McCormick on Evidence*, Section 337, at 412 (5th Ed.1999). Thus, the facts presented to the juvenile court with respect to a discretionary transfer must persuade the court that the juvenile is not amenable to care or rehabilitation in the juvenile system.

### 3. Standard of proof

{¶ 28} We now turn to Nicholas's first proposition of law, in which he asks this court to hold that clear and convincing evidence must support a juvenile court's finding of nonamenability in order to satisfy a juvenile's right to due process. The state responds that R.C. 2152.12(B)(3) itself sets out the applicable standard of proof—preponderance of the evidence—and argues that "due process is satisfied when a juvenile court issues a decision stating its reasons for the transfer after conducting a hearing at which the juvenile is represented by counsel," *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, citing *Kent v. United States*, 383 U.S. 541, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

{¶ 29} R.C. 2152.12(B)(3) requires a juvenile court to weigh the factors in R.C. 2152.12(D) in favor of transfer against the factors in R.C. 2152.12(E) against transfer. To find that a juvenile is not amenable to treatment in the juvenile system, the court need only conclude that the factors that favor transfer outweigh the factors that counsel against transfer. By requiring only a simple outweighing, R.C. 2152.12(B) by its terms establishes a preponderance-of-the-evidence standard for deciding a juvenile's amenability. " '[A] preponderance of evidence means the greater weight of evidence. * * * The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium.' " (Ellipsis sic.) *State v. Stumpf*, 32 Ohio St.3d 95, 102, 512 N.E.2d 598 (1987), quoting *Travelers'*

12

*Ins. Co. of Hartford, Connecticut v. Gath*, 118 Ohio St. 257, 261, 160 N.E. 710 (1928).

{¶ 30} This holding comports with other decisions of this court. For example, in determining that the standard of proof under R.C. 2305.02, a wrongful-conviction statute, was "the usual preponderance of the evidence standard," this court wrote, "The General Assembly, had it wanted to do so, knew how to specify a 'clear and convincing' standard.' " *Walden v. State*, 47 Ohio St.3d 47, 53, 547 N.E.2d 962 (1989). The Revised Code contains many statutes that expressly impose a clear-and-convincing-evidence standard of proof. *See, e.g.*, R.C. 2152.14(E) (requiring findings by clear and convincing evidence to invoke the adult portion of a serious-youthful-offender disposition); R.C. 5120.17(B)(4) (requiring clear and convincing evidence of an inmate's mental illness to transfer the inmate to a psychiatric hospital); R.C. 2151.414(B)(1) (requiring clear and convincing evidence that it is in a child's best interest to grant permanent custody of the child to a public children-services agency or private child-placing agency). R.C. 2152.12(B)(3) contains no such language. Rather, the statutory language is wholly consistent with a preponderance-of-the-evidence standard of proof.

{¶ 31} Irrespective of the clear statutory language, Nicholas argues that the constitutional guarantee of due process requires application of a clear-and-convincing-evidence standard when determining a juvenile's amenability to treatment or rehabilitation in the juvenile system. We disagree.

{¶ 32} "Due-process rights are applicable to juveniles through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution." *In re D.S.*, 146 Ohio St.3d 182, 2016-Ohio-1027, 54 N.E.3d 1184, ¶ 28. And the standard of proof that applies in a given case does implicate a facet of due process. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our

society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), quoting *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). "*Addington* teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

{¶ 33} The United States Supreme Court has held that a preponderance-of-the-evidence standard is inadequate to satisfy due-process requirements in certain types of cases. In *Addington*, for example, it held that the Fourteenth Amendment requires a standard of clear and convincing evidence in a civil state-law proceeding to involuntarily commit an individual for an indefinite period to a state mental hospital. A standard of proof higher than preponderance of the evidence was necessary because commitment entails a loss of liberty, which "calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior" or by "a few isolated instances of unusual conduct." *Addington* at 427. Similarly, in *Santosky*, the Supreme Court held that a New York law that provided for the termination of parental rights required a heightened standard of proof rather than a finding " 'by a fair preponderance of the evidence' " that a child had been permanently neglected. *Santosky* at 748, quoting N.Y.Fam.Ct.Act 622. It held, "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Id*. at 747-748. A decision to transfer a case from juvenile court to adult court, however, is not comparable to the situations in *Addington* and *Santosky* involving an

involuntary and indefinite commitment to a mental-health facility or the permanent loss of custody of one's child.

{¶ 34} The United States Supreme Court "has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court." *Breed v. Jones*, 421 U.S. 519, 537, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). For purposes of transferring a case from juvenile court to adult court, the Supreme Court has held, albeit without specifically addressing the required standard of proof, that the requirements of due process are satisfied when a juvenile court issues a decision stating its reasons for the transfer after first conducting a hearing at which the juvenile is represented by counsel. *Kent*, 383 U.S. at 557, 86 S.Ct. 1045, 16 L.Ed.2d 84. And federal circuit courts have gone further, expressly holding that the Due Process Clause of the United States Constitution does not require a clear-and-convincing-evidence standard with respect to juvenile-transfer decisions. *See, e.g.*, *United States v. Juvenile Male*, 554 F.3d 456, 460 (4th Cir.2009); *United States v. Doe*, 49 F.3d 859, 868 (2d Cir.1995); *United States v. T.F.F.*, 55 F.3d 1118, 1122 (6th Cir.1995); *United States v. A.R.*, 38 F.3d 699, 703 (3d Cir.1994); *United States v. Parker*, 956 F.2d 169, 171 (8th Cir.1992); *United States v. Brandon P.*, 387 F.3d 969, 976-977 (9th Cir.2004). We agree with those courts.

{¶ 35} For these reasons, we hold that under the plain language of R.C. 2152.12(B)(3), a juvenile court's decision to exercise its discretion to transfer a juvenile to adult court must be supported by a preponderance of the evidence, not by the higher clear-and-convincing-evidence standard that Nicholas proposes.

*4. Consideration of juvenile dispositions*

{¶ 36} In his third proposition of law, Nicholas asks this court to require a juvenile court to consider as part of its amenability analysis all the dispositional options that would be available to the court should it retain jurisdiction and then make an adjudication of delinquency. Nicholas maintains that the juvenile court

15

must do so under the catch-all provisions—which allow consideration of "any other relevant factors"—in R.C. 2152.12(D) and (E).

{¶ 37} Dispositional statutes in R.C. Chapter 2152 begin with the phrase, "If a child is adjudicated a delinquent child." *See, e.g.*, R.C. 2152.11, 2152.16, and 2152.19. They therefore apply only after a delinquency adjudication has been made.

{¶ 38} One disposition that is available to a juvenile court in certain circumstances is a serious-youthful-offender disposition—a blended sentence that consists of a juvenile disposition coupled with a stayed adult sentence. R.C. 2152.13(D). A juvenile court that imposes a serious-youthful-offender disposition may enforce the stayed adult sentence only if the juvenile commits specified acts that indicate that the juvenile disposition has not been successful in rehabilitating the juvenile. *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 2, citing R.C. 2152.14. The General Assembly has defined "serious youthful offender" as a person eligible for a mandatory or discretionary serious-youthful-offender disposition "*who is not transferred to adult court under a mandatory or discretionary transfer*." (Emphasis added.) R.C. 2152.02(W). By definition, a juvenile who is eligible for discretionary transfer cannot be a "serious youthful offender" until the juvenile court decides not to transfer the juvenile to adult court. Thus, consideration of a serious-youthful-offender disposition does not arise until *after* the juvenile court has concluded that a juvenile subject to transfer is amenable to care or rehabilitation in the juvenile system and has adjudicated the juvenile to be a delinquent child. A juvenile court therefore need not consider the availability of a serious-youthful-offender disposition as a factor in an amenability determination.

{¶ 39} Two of the factors that a juvenile court must consider in determining a juvenile's amenability to treatment in the juvenile system focus on the efficacy of the system to rehabilitate the juvenile. Those factors are counterpoints; a finding

that there *is not* sufficient time to rehabilitate the child within the juvenile system supports a transfer to adult court, R.C. 2152.12(D)(9), whereas a finding that there *is* sufficient time to rehabilitate the child within the juvenile system weighs against transfer, R.C. 2152.12(E)(8). The potential availability of a serious-youthful-offender disposition does not affect the weighing of those factors. The focus remains on whether the juvenile system can help the juvenile, not on what sanction the juvenile court can impose.

### B. Application of the law to the facts of this case

{¶ 40} The procedure leading up to the juvenile court's amenability determination in this case was proper. The state filed a motion asking the juvenile court to transfer Nicholas to the adult court. The juvenile court ordered a medical examination and an investigation into factors bearing on Nicholas's amenability to juvenile rehabilitation. The juvenile court then conducted an amenability hearing at which Nicholas was represented by counsel, and the court admitted exhibits and heard testimony from witnesses called by both parties. And to determine whether Nicholas was amenable to care or rehabilitation in the juvenile system, the juvenile court weighed the statutory factors that favored transfer against the statutory factors that favored the juvenile court's retention of jurisdiction.

{¶ 41} As noted above, the juvenile court made three findings that weighed in favor of transfer: (1) Taylor suffered physical and psychological harm, R.C. 2152.12(D)(1), (2) Nicholas's relationship with Taylor facilitated the charged acts, R.C. 2152.12(D)(3), and (3) Nicholas used a firearm during the commission of the charged acts, R.C. 2152.12(D)(5). The juvenile court made two findings that weighed against transfer—Nicholas had not previously been adjudicated a delinquent child, R.C. 2152.12(E)(5), and Nicholas had a mental illness, R.C. 2152.12(E)(7).

{¶ 42} The court also found that Nicholas appeared to be "highly intelligent," that he presented to the court "with a level of maturity that belies the

circumstances of this matter," and that the court could maintain jurisdiction over Nicholas for six years. Whether a juvenile is "emotionally, physically, or psychologically mature enough for the transfer" may weigh either in favor of or against transfer. R.C. 2152.12(D)(8) and (E)(6). Although Nicholas emphasized in his memorandum in opposition to a transfer that he measured only 5'3" tall and weighed only 108 pounds, the juvenile court made no finding regarding Nicholas's physical maturity. The court did not distinguish between Nicholas's emotional, physical, and psychological maturity, nor did it state whether it weighed Nicholas's "maturity" in favor of or against transfer.

{¶ 43} Ultimately, in justifying its transfer decision, the juvenile court stressed the weight it placed on one finding. It stated, "In particular the Court finds that because [DYS] cannot offer the specific treatment necessary to rehabilitate [Nicholas], the juvenile system cannot provide a reasonable assurance of public safety." The juvenile court based that part of its holding primarily on its finding that DYS "does not have the resources or capability of treating Dissociative Identity Disorder, which requires a long-term intensive treatment plan that may require 24 hours /7-day supervision and support for the juvenile." But the testimony presented during the amenability hearing, particularly the testimony of Dr. Hrinko and Book (the Acting Chief of Behavioral Health Services at DYS), does not support the juvenile court's finding regarding DYS's ability to treat Nicholas.

{¶ 44} Dr. Hrinko explained:

> There is research indicating that extensive psychotherapy, mental health counseling, individual, sometimes groups, focusing on helping the weaker personality develop and adopt many of the qualities of the pathological personality within reason and with counterbalances allows them to gain the strength to get the other personality to kind of blend in with proper checks and balances. In

other words, take the qualities of Jeff that could be positive, when appropriately used, and integrate that into [Nicholas].

{¶ 45} Dr. Hrinko also testified that medication may reduce Nicholas's experiences of depression and anxiety, which would in turn allow him to be more responsive to the psychotherapy necessary to treat his dissociative-identity disorder.

{¶ 46} Appropriate treatment for Nicholas, Dr. Hrinko stated, would include weekly sessions with a psychologist who is willing "to spend the time necessary to work with him individually to talk about how to reintegrate, to talk about these qualities [Nicholas] believes he doesn't have that was the fertile ground for Jeff to emerge, and to allow him opportunities in a controlled environment to use and practice those skills." He suggested that it would benefit Nicholas if DYS were able "to get ahold of somebody to talk [Nicholas] through" a situation in which Nicholas recognized Jeff wanting to act out. And he stated that "24/7 supervision and support would allow [Nicholas] real-world assistance at making the better decisions to reintegrate those personalities." Dr. Hrinko believed that a long-term youth-services facility could provide the necessary treatment.

{¶ 47} Dr. Hrinko could point to no specific study involving the treatment of dissociative-identity disorder in juveniles who have committed violent crimes, but he reasoned that the successful treatment of dissociative-identity disorder in other populations suggests it would likewise be effective in reducing the risk of violence by a juvenile who has committed a violent crime while suffering from the disorder. He noted that Nicholas was particularly well-suited for successful treatment because he had not yet "blocked out Jeff as an existence." Because Nicholas "knows Jeff exists" and "doesn't like Jeff," Dr. Hrinko stated, Nicholas "is willing to work hard to help Jeff go away." Although Dr. Hrinko could not state with certainty that Nicholas would be able to safely reintegrate into society within

five years, and he acknowledged that Nicholas would remain dangerous if treatment were unsuccessful, his expert opinion was that Nicholas was amenable to treatment and rehabilitation in the juvenile system and that safe reintegration into society was likely.

{¶ 48} The juvenile court erroneously postulated a requirement for 24-hour-a-day, 7-day-a-week psychological supervision from Dr. Hrinko's statement that Nicholas should have someone available to him should he need to talk through a conflict in which he recognized that Jeff wanted to act out. Dr. Hrinko stated that Nicholas should have around-the-clock supervision and support, but he did not testify that Nicholas needed supervision by or face-to-face access to *a psychologist* 24 hours a day, 7 days a week. To the contrary, he suggested that weekly sessions between Nicholas and a psychologist would generally be appropriate, when coupled with a secure and "controlled environment [in which Nicholas would] use and practice [the] skills" he would develop in psychotherapy. Dr. Hrinko premised his opinion regarding Nicholas's amenability on Nicholas being committed to a residential facility, with its inherent around-the-clock supervision and control. He stated that 24-hour supervision and support would provide Nicholas "real-world assistance at making * * * better decisions."

{¶ 49} Setting aside the juvenile court's unsupported belief that treatment for dissociative-identity disorder would require around-the-clock access to psychological counseling, the record is devoid of any evidence that supports the court's finding that DYS lacks the resources or capability to treat Nicholas for dissociative-identity disorder. Dr. Hrinko did not testify that Nicholas would require treatment from mental-health practitioners who have proven experience working with individuals suffering from dissociative-identity disorder. Indeed, although he recognized the relative rareness of that disorder, he was confident that Ohio's juvenile justice system could provide appropriate services to treat Nicholas.

{¶ 50} Turning now to Book's testimony, we note that she expressed no concern about DYS's ability to care for or provide rehabilitation to Nicholas, even though she was unaware of any DYS employee who had specific experience working with a juvenile who had been diagnosed with dissociative-identity disorder.

{¶ 51} In his cross-examination of Book, the prosecutor expressed concern that DYS would not be able to provide the "very specific treatment" for dissociative-identity disorder that the state claimed had been recommended by Dr. Hrinko. But Book stated that to answer the prosecutor's questions about "specific treatment," she "would need to know what the treatment recommendations were." When the prosecutor followed up, asking whether "the treatment option" that Dr. Hrinko purportedly testified to "is something that is available" through DYS, she again responded, "I don't know what the evaluating clinician recommended." She explained, "[W]here I'm struggling is that you keep referring to a treatment recommendation for this diagnosis and I don't know what that is." Nevertheless, she stated that if Nicholas were committed to DYS custody, DYS would conduct a complex assessment to build an individualized treatment plan that may include such components as medication, cognitive behavioral therapy, and psychiatric services, as warranted. She also stated that DYS would "do [its] best to follow Court orders" regarding treatment.

{¶ 52} There is simply no evidence in the record that treatment for dissociative-identity disorder is beyond the capabilities of the medical and mental-health professionals who provide treatment for other mental-health conditions to the juveniles in DYS custody. Underscoring the juvenile court's misunderstanding of Dr. Hrinko's testimony, the court asked Book, "If I told you that the diagnosing provider said that this young man would need 24/7 supervision and support from a psychologist, would you be able to provide that?" The court then rephrased the question to ask whether Nicholas would be able to meet with his psychologist 24

hours a day, 7 days a week, or any time his alternate personality came out. Book could not say that DYS would have an on-call psychologist available to Nicholas 24 hours a day, but she testified that if issues arise on the weekends or during overnight hours, DYS's policy is to contact the facility's psychology supervisor, who would consult over the phone if he or she was not in the facility.

{¶ 53} Despite the lack of context provided to Book during the prosecutor's interrogation of her about DYS's ability to provide "specific treatment" for dissociative-identity disorder, she testified, "If you say to me [that] psychiatry in combination [with] cognitive behavioral therapy [("CBT")] is the recommended treatment for this particular youth with this particular diagnosis, can I provide CBT and psychiatric services? Yes." Thus, psychotherapy—the primary component of the treatment Dr. Hrinko generally recommended for Nicholas—is something Book testified that DYS could provide. And again, the record contains no evidence to suggest that a licensed psychologist or psychiatrist—such as those on staff or contracted by DYS—could not provide psychotherapy aimed at treating dissociative-identity disorder.

{¶ 54} The juvenile court's and court of appeals' opinions give rise to a particularly concerning suggestion, namely, that the state can deny a juvenile access to the rehabilitative goals of the juvenile system based on the state's own failure to make necessary services available. The question of a juvenile's amenability to care and rehabilitation in the juvenile system is one of *the juvenile's* rehabilitative potential, and it is separate from the question of the services the state has to offer or the services a juvenile-court judge *perceives* the state has to offer. *See United States v. Tillman*, 374 F.Supp. 215, 223 (D.D.C.1974) (holding that that there was no legal authority for diverting a juvenile to an adult institution simply due to lack of space or "because of the inability of the [youth] correctional institutions to provide treatment contemplated by the [Federal Youth Corrections] Act"); *In re Welfare of J.E.C. v. State*, 302 Minn. 387, 393, 225 N.W.2d 245 (1975) ("The

absence of rehabilitative facilities to treat appellant may not mean he is not amenable to treatment as a juvenile if such facilities were available").

{¶ 55} The conflation of the distinct issues of amenability and available services is especially inappropriate in Ohio because R.C. Chapter 2152 does not limit a juvenile court's dispositional options to DYS commitment should the juvenile court retain jurisdiction. To the contrary, the court may, in addition to any other disposition authorized or required by R.C. Chapter 2152, commit a delinquent child

> to the temporary custody of any school, camp, institution, or other facility operated for the care of delinquent children by the county, by a district organized under section 2152.41 or 2151.65 of the Revised Code, or by a private agency or organization, within or without the state, that is authorized and qualified to provide the care, treatment, or placement required.

R.C. 2152.19(A)(2). And although we have held that a juvenile court is not required to consider specific dispositions as part of its consideration whether to transfer a juvenile to adult court, it may not base a decision to transfer a child to adult court on a perceived lack of DYS resources when the General Assembly has made available other options should the need for those additional resources arise.

{¶ 56} Here, the juvenile court's decision that Nicholas is not amenable to treatment and rehabilitation in the juvenile system was based on a perception that DYS lacks the necessary resources to treat Nicholas's mental illness—a perception that is not only unsupported by the record but that is, in fact, *contrary to* the reality established by the record. Absent that misperception, the juvenile court's amenability determination is not supported by the preponderance of the evidence and constitutes an abuse of discretion.

### III. Conclusion

**{¶ 57}** For these reasons, we hold that the standard of proof applicable to discretionary-bindover proceedings is a preponderance of the evidence and that while the state bears the ultimate burden of persuasion on the question of a juvenile's nonamenability to treatment and rehabilitation in the juvenile system, the state need not produce affirmative evidence of nonamenability. We further hold that a juvenile court need not consider all potential juvenile dispositions, including a serious-youthful-offender disposition, when balancing the factors weighing in favor of and against transfer.

**{¶ 58}** In applying those holdings here, however, we must reverse the court of appeals' decision affirming the juvenile court's decision to transfer Nicholas to adult court. The juvenile court's findings regarding the requirements for treating dissociative-identity disorder and regarding DYS's capability to meet those requirements are based on the court's mischaracterization of the testimony of Dr. Hrinko and Book and are not supported by evidence in the record. And it was upon those unsupported findings that the court determined that Nicholas was not amenable to care or rehabilitation in the juvenile system. We therefore conclude that the juvenile court's decision to transfer Nicholas to adult court was not supported by the preponderance of the evidence and that the juvenile court abused its discretion by relinquishing jurisdiction. Accordingly, we reverse the judgment of the Second District Court of Appeals, vacate the judgment of the Champaign County Court of Common Pleas, General Division, and remand this matter to the Champaign County Court of Common Pleas, Juvenile Division, for further proceedings.

Judgment reversed
and cause remanded.

DONNELLY, STEWART, and BRUNNER, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by FISCHER and DEWINE, JJ.

24

_____

**KENNEDY, J., dissenting.**

**{¶ 59}** I dissent from the majority's judgment that the juvenile court abused its discretion in granting the state's motion for discretionary bindover. That issue was not raised by the appellant, Donovan Nicholas, and therefore it is beyond the scope of this appeal. *See Ayers v. Cleveland*, 160 Ohio St.3d 288, 2020-Ohio-1047, 156 N.E.3d 848. On the issues that are before this court, I would affirm the judgment of the appellate court that the juvenile court applied the correct burden of proof and burden of production and that the plain and unambiguous language of R.C. 2152.12 does not require the juvenile court to consider alternative dispositions. Because the majority does otherwise, I dissent.

**The juvenile court did not abuse its discretion;**

**the majority creates an outcome**

**{¶ 60}** There are two problems with the majority's analysis. First, the majority is wrong about the evidence and the law. Second, the majority should not raise and resolve issues that are not properly before the court to create an outcome.

*The majority is wrong on the evidence and the law*

**{¶ 61}** Nicholas is charged with violently killing Heidi Fay Taylor because "Jeff the Killer" lives inside him.

**{¶ 62}** A detective testified at the amenability hearing that Nicholas had called the person he called "Mom" to come downstairs so Nicholas could emerge from his hiding place and stab her. He stabbed her over 60 times. According to the detective, Nicholas ignored the victim's pleas for mercy, and when she tried to make her way back upstairs, he knew why—and he ran past her so he could retrieve her cellphone before she could call for help. He then loaded a gun and shot her in the head.

**{¶ 63}** When law-enforcement officers entered the home and found Nicholas in the kitchen in a bloodstained shirt, Nicholas asked the officers, "Do

you know about multiple personality disorder?" and then stated, "I have that and his name is 'Jeff.' "

{¶ 64} The state asserted in its motion to transfer Nicholas's case to the adult court that he was "not amenable to the care or rehabilitation within the juvenile system and the safety of the community require[d] that the juvenile be subject to adult sanctions" under R.C. 2152.12(B).

{¶ 65} In support of its motion, the state asserted that in conjunction with other factors that would be presented at the hearing on the motion to transfer, the state would show that (1) the victim suffered "serious physical or psychological harm" prior to her death, (2) the victim's relationship with Nicholas "facilitated the acts charged," (3) Nicholas had a "firearm on or about his person * * * during the commission of the acts charged [and] brandished, displayed and used the firearm" to intentionally kill the victim, (4) because the acts charged were "planned, deliberate, and premeditated," Nicholas was "emotionally, physically, or psychologically mature enough for the transfer," and (5) there was not sufficient time to "rehabilitate the juvenile within the juvenile system."

{¶ 66} Prior to the bindover hearing, the juvenile court, as required by R.C. 2152.12, ordered an evaluation into Nicholas's "social history, education, family situation, and any other factor bearing on whether [he was] amenable to juvenile rehabilitation." The entry also ordered that a mental evaluation be conducted by Dr. Daniel Hrinko.

{¶ 67} Dr. Hrinko testified that Nicholas had a condition known as dissociative-identity disorder, the symptoms of which include a disruption of identity characterized by two or more distinct personality states. Nicholas had two personality states, according to Dr. Hrinko: "himself"— Nicholas—and "Jeff the Killer." Dr. Hrinko testified that Nicholas would need *extensive and intensive therapy* to treat the dissociative-identity disorder and that around-the-clock supervision and support might be needed. He discussed a process called

reintegration that includes therapy to help the weaker personality develop and adopt many of the qualities of the pathological personality that might be positive. Dr. Hrinko testified that "research shows that with intensive therapy lasting several years, [reintegration] can be done." On cross-examination, Dr. Hrinko acknowledged that Nicholas posed a significant hazard to the community, based on the act he had committed but also on the fact that *"Jeff"* had intentions of harming other people. Dr. Hrinko testified that Nicholas's "dangerousness to the community is not only based on what he did but what Jeff was talking about doing at other times to other people."

{¶ 68} Dr. Hrinko testified that it was "incredibly rare" for someone as young as Nicholas to have dissociative-identity disorder and that the level of violence Nicholas had committed also was rare among people with dissociative-identity disorder. He testified that he could point to no *specific* study demonstrating that adolescents with dissociative-identity disorder who perpetrate violent crimes could be treated. He also testified that he believed that therapies that work to reduce bad behavior in other patients could also work on Nicholas. Dr. Hrinko could not give a firm timetable for how long of a treatment plan would be necessary to help Nicholas, mentioning that treatment programs "are either residential-type inpatient programs that typically rarely last more than a year or lengthy outpatient programs that last seven, eight, nine, ten years." Dr. Hrinko stated that the effectiveness of any therapy depended on Nicholas: "*And if he continues to exercise extremely poor judgment,* such as going into psychotherapy and saying nothing is wrong and leave me alone, then nothing will change and his risk will remain very high." (Emphasis added). On questioning from the court, Dr. Hrinko testified that if Nicholas were unable to reintegrate Jeff, *"the research suggests that Jeff will gain further power, further control more often, and * * * bad things will happen."* (Emphasis added.) Dr. Hrinko's testimony about the treatment of dissociative-identity disorder was not specific to incarcerated individuals.

**{¶ 69}** The juvenile court then heard from an employee of the Department of Youth Services who testified regarding the availability of the recommended treatment in Department of Youth Services facilities. Sarah Book, acting chief of Behavioral Health Services at the Department of Youth Services, testified that she had never encountered anyone who had been identified with or diagnosed with dissociative-identity disorder. She was unaware of any juvenile in a Department of Youth Services facility who had been diagnosed with dissociative-identity disorder; due to data limitations, she was limited to a three-year lookback. She could not commit to accepting Dr. Hrinko's diagnosis and treatment plan. Book testified that the Department of Youth Services would conduct an independent assessment of Nicholas and adopt a treatment plan, but she did not know what that treatment plan would be and could not commit to reintegration therapy, stating only that "[a]ll things would be considered." Upon questioning from the court, she testified that the Department of Youth Services could not make a psychologist available for face-to-face consultation at all hours of the day, seven days a week.

**{¶ 70}** Based on the foregoing testimony, the juvenile judge concluded that the Department of Youth Services "does not have the resources or capability of treating Dissociative Identity Disorder, which requires a long-term intensive treatment plan that may require 24 hours/7-day supervision and support."

**{¶ 71}** The majority seemingly finds that the juvenile court abused its discretion in making this determination: it concludes that the juvenile court erred in considering the ability of the juvenile system to provide proper mental-health treatment for Nicholas. But that conclusion is just wrong on the law.

**{¶ 72}** There are three findings that the juvenile court must make before transferring a juvenile case to the adult court. *See* R.C. 2152.12(B). The third finding is that the child is "not amenable to care or rehabilitation within the juvenile system." R.C. 2152.12(B)(3). If the juvenile system does not have mental-health-treatment services available to provide appropriate clinical treatment to Nicholas or

if the expertise to reintegrate "Jeff the Killer" into Nicholas is not available in the juvenile system, then how can Nicholas be amenable to care or rehabilitation in the juvenile system? The majority is consciously deciding to place Nicholas in the juvenile system, knowing that the Department of Youth Services had no record of treating a juvenile with dissociative-identity disorder, did not have treatment services in place for dissociative-identity disorder or reintegration therapy, and did not have a psychologist in a facility 24 hours/7days a week.

{¶ 73} "[A] juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse-of-discretion standard." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 14. "If there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion." *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 401, 696 N.E.2d 575 (1998).

{¶ 74} In my view, the evidence set forth above supports the ultimate determination by the juvenile court that Nicholas was not amenable to care or rehabilitation within the juvenile system as well as its decision to transfer the case to the adult court. The juvenile court did not abuse its discretion here. But the issue of whether the juvenile court abused its discretion in determining to bind over Nicholas's case to the adult court is not before this court. Nicholas did not appeal that issue to this court. The majority, toiling for the outcome it wants, creates and resolves an issue Nicholas has not raised in this court, picking up where the dissent in the court of appeals left off.

*The majority improperly raises and resolves an issue not before the court*

{¶ 75} Nicholas submitted a jurisdictional memorandum to this court setting forth three propositions of law. This court accepted jurisdiction over those propositions of law, which are as follows:

Proposition I: Because standards of review are functions of due process, non-amenability decisions must be supported by clear and convincing evidence.

Proposition II: As the party moving for discretionary transfer under R.C. 2152.12(B), prosecutors bear the burden of proving the child is not amenable to juvenile court treatment. A transfer decision without any affirmative proof of non-amenability must be reversed.

Proposition III: To meaningfully decide whether juvenile offenders are not amenable to juvenile court treatment, juvenile judges must first weigh all the available dispositional options, especially, where provided by statute, a serious youthful offender disposition.

*See State v. Nicholas*, 161 Ohio St.3d 1439, 2021-Ohio-375, 162 N.E.3d 822. *Compare* 2020-Ohio-3478, 155 N.E.3d 304, ¶ 49 (the only error assigned in regard to the juvenile proceedings in the court of appeals was that the juvenile court abused its discretion and violated Nicholas's right to due process by transferring his case to the adult court).

{¶ 76} In his first assignment of error before the appellate court, Nicholas argued: "The juvenile court abused its discretion and violated [Nicholas's] right to due process of law when it disregarded uncontroverted evidence and transferred his case for criminal prosecution." That argument was premised on three issues: (1) "Did the juvenile court act unreasonably and arbitrarily when it independently disregarded the only expert opinions available, and without offering an explanation for its decision?" (2) "Was the juvenile court's primary reason for relinquishing jurisdiction unsupported by the record?" (3) "Was it unreasonable for the juvenile court to transfer [Nicholas's] case based on a mistake of fact regarding the juvenile

system's rehabilitation services, and without first considering all available options?"

**{¶ 77}** In a split decision, the court of appeals held that the trial court had not abused its discretion in transferring the case to adult court. But Nicholas chose not to appeal that holding to this court. And although the majority here addresses the three propositions of law we accepted, it renders a judgment on that entirely different, unraised issue: whether the juvenile court abused its discretion in its weighing of the amenability factors.

**{¶ 78}** As stated, Nicholas did not raise the abuse-of-discretion issue in this court, despite the fact that in the court of appeals, one dissenting judge would have held that the juvenile court had abused its discretion. That dissenting judge concluded that the trial court had misinterpreted the testimony about the level of care available in a Department of Youth Services facility:

> [T]he court's conclusion that [the Department of Youth Services]
> "does not have the resources or capability of treating [dissociative-
> identify disorder], which requires a long-term intensive treatment
> plan that may require 24 hours/7-day supervision and support," was
> not supported by the record. This finding was not premised upon
> facts established at the hearing and was speculative. Furthermore,
> it ignored the availability of other institutions/resources, both public
> and private, within the community and/or State which are not
> operated by [the Department of Youth Services].

2020-Ohio-3478, 155 N.E.3d 304, at ¶ 199 (Donovan, J., dissenting). The dissenter asserted that "[t]he availability of resources has absolutely nothing to do with an individual assessment of blameworthiness, maturity and amenability. The overarching interest in an amenability determination is the welfare of the child, and

the decision to throw away a child should not be dependent on the fiscal welfare of the state." *Id*. at ¶ 199 (Donovan, J., dissenting).

**{¶ 79}** After examining the evidence, including the testimony of Dr. Hrinko, Book, and the guardian ad litem, the dissenting judge concluded that Nicholas's conviction was "based upon an improper bindover to adult court" and stated that a "remand to the juvenile court [was] warranted." *Id*. at ¶ 221. That dissent laid the groundwork for the majority's opinion and judgment.

**{¶ 80}** The majority determines that the juvenile court abused its discretion in granting the state's discretionary-bindover motion because (1) the juvenile court had erred in considering the ability of the juvenile system to provide the proper mental-health treatment for Nicholas and (2) the juvenile court had misinterpreted the testimony of Book on the ability of the juvenile system to provide the care that someone with dissociative-identity disorder would need. The majority ignores the juvenile court's findings and substitutes its own interpretation of Book's testimony to create the outcome it wants. Then, instead of reversing and remanding the matter to the court of appeals, the majority reweighs the evidence.

**{¶ 81}** The majority concludes that without the misperception that the Department of Youth Services lacked the necessary resources to treat Nicholas's mental illness, the remaining factors in support of transfer to the adult court do not outweigh the factors favoring the retention of the case by the juvenile court. Therefore, the majority holds the juvenile court's amenability determination "is not supported by the preponderance of the evidence and constitutes an abuse of discretion." Majority opinion, ¶ 56.

**{¶ 82}** But "[i]t has long been the policy of this court not to address issues not raised by the parties. * * * This court should be hesitant to decide such matters for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination." *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2.

**{¶ 83}** An appellate court relies on the parties in a case to determine the issues before it and to argue the applicable law:

> "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan* (C.A.D.C.1983), 714 F.2d 171, 177. Proceeding to decide an issue not briefed by the parties creates " 'the risk "of an improvident or ill-advised opinion, given [the court's] dependence * * * on the adversarial process for sharpening the issues for decision." ' " *Carbino v. West* (C.A.Fed.1999), 168 F.3d 32, 35, quoting *Headrick v. Rockwell Internatl. Corp.* (C.A.10, 1994), 24 F.3d 1272, 1278, quoting *Herbert v. Natl. Academy of Sciences* (C.A.D.C.1992), 974 F.2d 192, 196.

(Brackets sic.) *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part).

**{¶ 84}** Regardless of its reason or passion, the majority should heed our limited role as expressed by the United States Supreme Court: "[I]n both civil and criminal cases, in the first instance and on appeal * * *, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008).

**The resolution of the propositions of law accepted by this court**

**{¶ 85}** I agree with the majority's resolution of the three propositions of law that are before this court. The standard of proof applicable in discretionary-bindover proceedings is proof by a preponderance of the evidence. The state does

bear the burden of persuasion on the question of a juvenile's nonamenability to treatment and rehabilitation in the juvenile system, but the state is not required to produce affirmative evidence of nonamenability. And the plain language of the bindover statute does not require the juvenile court to consider all potential juvenile dispositions, including a serious-youthful-offender disposition, as part of its balancing of the factors in favor of and against bindover, because consideration of a disposition by the juvenile court occurs only after, not before, a child is found to be a delinquent child. The resolution of those three issues should end this court's consideration.

{¶ 86} While the majority probably believes it is being benevolent in creating a resolution to place Nicholas back in the juvenile system, there are consequences to its decision. Nicholas is currently 20 years old, and when returned to the juvenile system by the majority, he will be under the jurisdiction of the juvenile court for less than one more year. It is unknown whether Nicholas has ever accepted the need for psychotherapy. Any reintegration therapy he has been receiving in the adult facility will terminate. And he will be placed in the custody of the Department of Youth Services which, at the time of his amenability hearing, had not conducted an assessment or treatment plan, had no record of treating anyone with dissociative-identity disorder, did not have a treatment plan in place to treat anyone with dissociative-identity disorder, could not guarantee that Nicholas would receive reintegration therapy, and could not provide an onsite psychologist at all times. Barring the commission of another crime, Nicholas could be released into the world in less than a year. And anyone who encounters him would have to hope that "Jeff the Killer" had been reintegrated.

## Conclusion

{¶ 87} The majority is wrong on the evidence and the law. The juvenile court did not abuse its discretion in ordering Nicholas's case bound over to the adult court. To achieve its outcome, the majority engages in judicial overreach by

exercising authority beyond the scope of the appeal. In the end, the majority does a disservice to Nicholas and places the safety of other juveniles and care providers at risk. I dissent from the majority's judgment reversing the judgment of the appellate court, vacating the judgment of the general division of the common pleas court, and remanding the matter to the juvenile court. The majority is simply imposing a result that it wants, but it is a result that no one is, or can be, prepared for. Therefore, I dissent.

FISCHER and DEWINE, JJ., concur in the foregoing opinion.

————————————

Kevin S. Talebi, Champaign County Prosecuting Attorney, and Jane A. Napier and Benjamin T. Hoskinson, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, and Timothy B. Hackett, Assistant Public Defender, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, and Samuel C. Peterson, Deputy Solicitor General, urging affirmance for amicus curiae Ohio Attorney General Dave Yost.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, urging affirmance for amicus curiae Ohio Prosecuting Attorneys Association.

Kevin J. Truitt, urging reversal for amicus curiae Disability Rights Ohio.

Cullen Sweeney, Cuyahoga County Public Defender, and Erika B. Cunliffe, Assistant Public Defender, urging reversal for amicus curiae Cuyahoga County Public Defender.

National Association for Public Defense and H. Louis Sirkin, urging reversal for amicus curiae National Association for Public Defense.

Justice for Children Project and Kimberly Jordan, urging reversal for amicus curiae Justice for Children Project.

Raymond Faller, Hamilton County Public Defender, and Jessica Moss, Juvenile Appellate Trial Counsel, urging reversal for amicus curiae Hamilton County Public Defender.

Theresa Haire, Montgomery County Public Defender, and Kay Locke, Assistant Public Defender, urging reversal for Montgomery County Public Defender.

Yeura Venters, Franklin County Public Defender, and Timothy E. Pierce, Assistant Public Defender, urging reversal for Franklin County Public Defender.

Children's Law Center and Leah R. Winsberg, urging reversal for amicus curiae Children's Law Center.

_____