[Cite as *State v. Rojas*, 2024-Ohio-2209.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS. CA2023-07-007 |
| | | CA2023-06-006 |
| | : | |
| - vs - | : | O P I N I O N |
| | : | 6/10/2024 |
| ROSALINDA CAROL ROJAS, | : | |
| Appellant. | : | |

APPEALS FROM PREBLE COUNTY COURTS OF COMMON PLEAS,
GENERAL DIVISION, Case No. 21CR013712
and JUVENILE DIVISION, Case No. 20212074

Martin P. Votel, Preble County Prosecuting Attorney, and Kathryn M. West, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Charlyn Bohland, Assistant State Public Defender, for appellant.

**HENDRICKSON, J.**

{¶ 1}   Appellant, Rosalinda Carol Rojas, appeals from a reverse bindover decision in which the Preble County Court of Common Pleas, Juvenile Division, concluded that she was not amenable to rehabilitation in the juvenile system following her guilty plea to felonious assault.  For the reasons that follow, we affirm the juvenile court's decision.

{¶ 2}   On July 15, 2021, appellant, then 17 years old, used a machete to attack the victim, T.D., at a campsite in Hueston Woods State Park.  T.D. sustained several deep, life-threatening injuries to her legs, arms, chest, and head that required surgery.  At the time of the attack appellant was under the influence of LSD.

{¶ 3}   A complaint was filed in the Preble County Juvenile Court on July 20, 2021 alleging that appellant was a delinquent child for committing acts that if charged as an adult would constitute one count of attempted murder, a felony of the first degree, two counts of felonious assault, second-degree felonies, and one count of assault, a misdemeanor of the first degree.  The state filed a motion for mandatory bindover to the Preble County Court of Common Pleas so that appellant could be prosecuted as an adult in accordance with R.C. 2152.12(A)(1)(a)(i).  That statute provides that if a complaint is filed alleging a child is a delinquent child for committing acts that if charged as an adult would constitute attempted murder, the juvenile court must transfer the case so that the child can be prosecuted as an adult if the child was 16 or 17 years old at the time of the act charged and there was probable cause to believe that the child committed the act charged.  Though felonious assault would normally be a discretionary-bindover offense under R.C. 2152.10, where it is filed as part of the same case as the attempted murder charge, "'the statute requires transfer of that charge as well.'"  *State v. Rojas*, 12th Dist. Preble No. CA2021-11-013, 2022-Ohio-2333, ¶ 3, quoting *State v. Echols*, 10th Dist. Franklin No. 19AP-587, 2021-Ohio-4193, ¶ 16.

{¶ 4}   The juvenile court held a probable cause hearing on the state's motion for mandatory bindover on July 28, 2021.  On August 2, 2021, the juvenile court issued an entry granting the state's motion after finding that appellant was 17 years old at the time of the attack and that there was probable cause to believe appellant committed all the

acts making up the four charged offenses. That same day, the Preble County Grand Jury returned an indictment charging appellant with one count of first-degree felony attempted murder.

{¶ 5} Appellant entered a not guilty plea to the indictment. While awaiting trial, appellant was held at a juvenile detention facility. On September 22, 2021, the common pleas court held a change of plea hearing wherein appellant entered a guilty plea to a reduced charge of second-degree felonious assault. In consideration of appellant's guilty plea to felonious assault, the remaining charges were dismissed. The common pleas court accepted appellant's guilty plea upon finding that the plea was knowingly, intelligently, and voluntarily entered. On October 11, 2021, the common pleas court held a sentencing hearing and sentenced appellant to an indefinite sentence of a minimum six years in prison to a maximum nine years in prison. Appellant was also ordered to pay court costs and restitution to the victim in the amount of $3,303.19. Following the imposition of her sentence, appellant was transferred into the custody of the Ohio Department of Rehabilitation and Corrections ("ODRC").

{¶ 6} Appellant appealed her sentence, arguing that the common pleas court erred in imposing a sentence without adhering to the reverse-bindover procedures set forth in R.C. 2152.121. "Reverse bindovers occur in cases where juveniles who were transferred to adult court are subsequently convicted of, or pleaded guilty to, offenses that would not have qualified for mandatory * * * transfer to adult court in the first instance." *State v. Peak*, 8th Dist. Cuyahoga No. 112842, 2024-Ohio-735, ¶ 12, citing R.C. 2152.121(B). *See also State v. D.B.*, 150 Ohio St.3d 452, 2017-Ohio-6952, ¶ 13 (Reverse-bindover procedures are "required if the crimes for which convictions were obtained, had they been delinquency charges, would have subjected the juvenile's case

only to discretionary, rather than mandatory transfer proceedings").  Under those circumstances, the common pleas court imposes an adult sentence, stays the sentence, and returns the case to the juvenile court through a reverse bindover for the imposition of a serious youthful offender ("SYO") disposition.  R.C. 2152.121(B)(3).  However, if the prosecutor files an objection to the imposition of a SYO disposition, the juvenile court must hold an amenability hearing to determine "whether the child is not amenable to care or rehabilitation within the juvenile system and whether the safety of the community may require that the child be subject solely to adult sanctions."  R.C. 2152.121(B)(3)(b).  Because the common pleas court did not apply the reverse-bindover procedures set forth in R.C. 2152.121(B)(3) to appellant's case following her guilty plea to felonious assault, we reversed her sentence and remanded the case for consideration and application of R.C. 2152.121.  *See Rojas*, 2022-Ohio-2333 at ¶ 10.

{¶ 7}   Upon remand, the common pleas court transferred the case to the juvenile court for a SYO disposition.  Appellant was removed from prison and placed at the West Central Juvenile Detention Center ("WCJDC").

{¶ 8}   On August 3, 2022, the prosecutor filed an objection to a SYO dispositional sentence and requested a hearing on appellant's amenability.  The prosecutor also moved for a new amenability evaluation, noting that a prior amenability evaluation that had been conducted by Dr. Joyce McGhee, Psy.D., in August 2021 was a year old.[1]  In that report, Dr. McGhee had opined that appellant, who at the time had been 17 years and 9 months old, was "amenable to care or rehabilitation within the juvenile system."  Appellant's legal

---

1. Dr. McGhee's amenability evaluation was conducted on August 5, 2021.  Her written report, dated September 1, 2021, was not filed with the juvenile court until September 8, 2021.  No amenability hearing was held following the filing of Dr. McGhee's evaluation as appellant was subject to mandatory bindover on the then-pending attempted murder charge.

counsel agreed that an updated amenability evaluation was necessary. The juvenile court ordered a new evaluation and scheduled an amenability hearing for October 10, 2022.

{¶ 9} On September 2, 2022, just two months shy of her 19th birthday, appellant was evaluated by Dr. Carla S. Dreyer, Psy.D. The in-person evaluation lasted approximately one hour and 25 minutes. During that time, Dr. Dreyer administered the Personality Assessment Inventory (PAI) and evaluated appellant using the HCR-20v3, "a structured clinical judgment risk assessment instrument used for individuals over the age of 18" that "indicates an assessment of historical factors, present clinical factors, and future risk management factors."[2] On September 19, 2022, Dr. Dreyer filed a written report with the juvenile court in which she expressed her professional opinion that "given [appellant's] risk for future violence and reoffending, risk factors, lack of protective factors, age, and history, [appellant] is not amenable to rehabilitation in the juvenile system at this time."

{¶ 10} Appellant requested a continuance of the amenability hearing and the appropriation of funds for a second amenability evaluation. The juvenile court granted the motion and appellant was evaluated by Dr. Daniel D. Hrinko, Psy.D., on October 26 and November 11, 2022. The evaluation consisted of a clinical interview lasting two and one-half hours and psychological testing lasting three and one-half hours. Dr. Hrinko assessed appellant utilizing the HCR-20v3 checklist as well as the Minnesota Multiphasic Personality Inventory-2RF ("MMPI-2-RF") and the Jesness Inventory Revised ("JI-R"). In

---

2. Dr. Dreyer explained in her written report that the HCR-20v3, rather than the Structured Assessment for Violence Risk in Youth ("SAVRY"), was utilized in appellant's evaluation because of her age. Dr. Dreyer explained the SAVRY "is often used in evaluation related to a youth's amenability to treatment for possible transfer to the adult criminal justice system. That is, the SAVRY is a checklist of risk and protective factors to assist in the assessment of a juvenile's risk for violence. However, this measure is for individuals aged 12 through 18. Given that [appellant] is currently 18 years, 10 months old, the SAVRY was not used in the current assessment."

a report dated November 15, 2022, Dr. Hrinko stated, "it is the opinion of this evaluator that [appellant] is a good candidate for rehabilitation within the services available within the juvenile justice system and that [appellant] does not pose a significant hazard to the safety of the community."[3]

{¶ 11} On February 15 and March 10, 2023, the juvenile court conducted an amenability hearing. At the time of the hearing, appellant was approximately nineteen-and-one-half years old. The hearing commenced with the parties stipulating to the admission of certain exhibits, including Dr. McGhee's September 2021 report, medical records for T.D., appellant's report cards from WCJDC, and appellant's institutional summary report from ODRC. Additional exhibits, including Dr. Dreyer's September 19, 2022 report, Dr. Hrinko's November 15, 2022 report, behavior logs from appellant's stay at WCJDC, photographs from the crime scene at Hueston Woods, appellant's recorded statements to law enforcement following her attack on T.D., an October 14, 2019 Incident Report from the Hamilton Police Department, and a January 25, 2020 Arrest Report from the Hamilton Police Department, were also entered into evidence at the hearing. The court heard testimony from witnesses called by both parties. The state presented testimony from the Ohio Department of Nature Resources (ODNR) officer who was first on the scene at Hueston Woods, the ODNR detective who investigated the incident, the victim of the attack and her mother, the MedFlight paramedic who treated and transported T.D. after the attack, and Dr. Dreyer. The defense presented testimony from Dr. Hrinko, Chuck Bechard, a teacher who taught appellant while she was held at WCJDC, and Jessica Jefferson, the Program Administrator for the Ohio Department of Youth Services ("DYS"). The defense also sought to introduce testimony from B.D., another individual

_____

3. Dr. Hrinko's written report was not filed with the juvenile court until December 1, 2022.

who had gone camping with appellant and T.D., but he did not appear when subpoenaed. B.D.'s recorded statement to law enforcement was entered into evidence.

{¶ 12} The witnesses' testimony and the exhibits entered into evidence indicated that appellant, T.D. and B.D. were camping in Hueston Woods on July 15, 2021. T.D. had taken marijuana and LSD on the camping trip. Appellant, T.D. and B.D. each took four tabs of LSD. It was appellant's second time using LSD.

{¶ 13} Although appellant and T.D. were not romantically involved, appellant began touching T.D. in a sexual manner. The touching began in T.D.'s car and continued in T.D.'s tent. T.D. rebuffed appellant's advances, forcefully pushing appellant away. Appellant became angry, storming out of the tent and screaming in pure rage. When appellant did not calm down, B.D. called T.D. to come out of the tent and help deal with appellant's behavior.

{¶ 14} As soon as T.D. exited the tent, appellant struck T.D. on the head with a machete, fracturing her skull and knocking her to the ground.[4] Appellant continued to strike appellant with the machete, causing numerous injuries to T.D.'s body. T.D.'s tibia and fibula were fractured in her left leg and she received a number of lacerations to her left leg, left forearm, and left chest. An artery in T.D.'s left arm was severed and an artery in her left leg was nicked. As T.D. lay bleeding on the ground, she asked appellant if she was going to die and appellant said, "Yes, yes you are."

{¶ 15} Law enforcement and emergency paramedics responded to the scene. Appellant was secured in the back of a police vehicle while T.D. was treated. T.D. required two tourniquets to stave blood flow and she was transported to a nearby hospital where she underwent emergency surgery to repair the severed and nicked arteries. T.D. then

---

4. T.D. brought the machete to the campground to cut firewood for a campfire.

faced a lengthy recovery. She was unable to walk for nearly six months and underwent physical therapy for approximately eight months. As of the date of the amenability hearing, she still had nerve damage to a couple of fingers. In addition to the physical pain and suffering she experienced, T.D. testified she was still dealing with the psychological ramifications of the attack. She now suffers from anxiety, anger issues, and PTSD. Her ability to work and attend college has been negatively impacted by the incident.

{¶ 16} Dr. Dryer testified that as part of her evaluation of appellant, she conducted a clinical interview, administered the PAI and the HCR-20v.3 to appellant, spoke with appellant's maternal grandmother and grandfather, and reviewed Dr. McGhee's September 2021 amenability report, appellant's juvenile court records, school records, records pertaining to the attack on T.D., records from WCJDC, and records from appellant's treatment at the Central Clinic/CDC from 2010 and 2011. Dr. Dreyer noted appellant's intellectual functioning was estimated to be in the low-average range, but that appellant's thoughts were logical, coherent, and goal directed and her judgment during the assessment was appropriate. Dr. Dreyer found that appellant's maturity, both emotionally and psychologically, was similar to that of her same-age peers.

{¶ 17} Dr. Dreyer explained that the results of the PAI were deemed invalid because of the manner in which appellant had responded to the testing. Appellant had attempted to "portray herself as being kind of exceptionally free of difficulties." As for the HCR-20v3, Dr. Dreyer explained that it is a "checklist of risk factors for violent behavior" wherein historical factors, present clinical factors, and future risk management factors are examined. The factors are scored as being "present," "partially present or possibly present," or "absent."

{¶ 18} Of the ten historical factors the assessment looks at, four factors were found

to be present (history of problems with violence, other antisocial behavior, substance use, and traumatic experiences), five factors were found to be partially or possibility present (history of problems with relationships, problems with employment, the existence of a personality disorder, the existence of violent attitudes, and problems with treatment or supervision), and one risk factor was absent (history of problems with major mental disorders).

{¶ 19} With respect to appellant's history of problems with violence, in addition to appellant's machete-attack on T.D., appellant's school records indicated she once threatened a peer with scissors and punched other children. As for her antisocial behaviors, there were a number of occasions where appellant broke the rules or engaged in criminal behavior. She began using marijuana at age 11. Once she reached high school, she began to skip school frequently. She was involved with the juvenile court for issues relating to truancy, theft, the commission of traffic offenses, and for possessing marijuana at school. She failed to attend juvenile court hearings on the various offenses identified above and was ordered by the juvenile court to spend a few days at the Juvenile Detention Center for failing to appear. At the time of her arrest for the attack on T.D., appellant had an outstanding warrant with the juvenile court for failing to attend a court appearance. However, appellant had never been committed to DYS as a juvenile court disposition.

{¶ 20} As for appellant's substance use issues, Dr. Dreyer noted that appellant has a "long-standing history of marijuana abuse," which started when she was 11 years old. Appellant reported using 4 grams of high-grade marijuana daily. Appellant also admitted to using ecstasy and to having used LSD on one occasion prior to the date of the attack on T.D. Appellant was once caught in school with marijuana in her sock, which resulted

in her taking "drug classes." Appellant also admitted to nicotine, tobacco, and alcohol use.

{¶ 21} Dr. Dreyer noted appellant has experienced a number of traumatic experiences in her life, including childhood neglect, an unstable upbringing, and a history of contacts with Children Services. Appellant's parents separated when she was two and she had minimal involvement with her biological father. He was deported to Mexico when she was 11 years old. Appellant's mother had substance abuse issues, which appellant witnessed firsthand when she saw her mother overdose and when her mother took appellant and her half-siblings to "dope houses." Appellant's mother died of complications from drug use in either 2018 or 2019.

{¶ 22} Mother's substance abuse issues led to appellant being placed in foster care for a few weeks when she was a baby and again when she was in the third grade. In both instances, appellant's maternal grandfather was able to obtain custody. Appellant lived with her stepfather, half-siblings, and maternal grandparents at the time of offense against T.D.

{¶ 23} As for appellant's partially or possibly present history of problems with relationships, Dr. Dreyer noted that appellant has a history of associating with peers who were "one or two years older" who "hav[e] a history of contacts with the court and us[e] marijuana." Appellant has also had problems with romantic relationships in the past. Appellant had a "long-term" romantic relationship that lasted over three years, which she described as "toxic" and full of arguments and verbal abuse. Appellant then engaged in a relationship with another inmate while in prison. Her pursuit of this relationship led to multiple violations of the prison's rules.

{¶ 24} Appellant also had a partially or possibly present history of problems with

employment. She quit one job after working at the job for only a week. She obtained another job where she worked for approximately three months before being arrested for the attack on T.D. Appellant had been scheduled to work on the day of the attack on T.D., but she skipped work to go to Hueston Woods.

{¶ 25} Dr. Dreyer felt appellant had features of an underlying personality disorder "which were apparent in terms of her history and are consistent with [a] history of trauma." Though appellant had some antisocial personality features and dependent relationship features, Dr. Dreyer did not believe that appellant "ha[d] enough of the characteristics to qualify for a full diagnosis of a personality disorder." As for appellant's possibly or partially present "violent attitude," Dr. Dreyer noted that appellant "has had a history of using aggression and being violent in various settings," including at school, during a fight in prison, and the attack in Hueston Woods.

{¶ 26} Dr. Dreyer also noted that appellant had previous involvement in outpatient services and she had not responded well to that treatment. After being found with marijuana at school, appellant had to participate in outpatient substance abuse treatment. Appellant also participated in outpatient treatment through Central Clinic/CDC when she was younger, around 2010 and 2011. Despite the treatment she received, appellant continued her drug use and other behavioral problems.

{¶ 27} With respect to the absent historical factor, Dr. Dreyer noted that appellant did not have any major mental disorders. However, historical records indicated that in 2011, appellant had been diagnosed by CDC with an adjustment disorder with mixed disturbance of emotions and conduct due to self-reported "sadness and problematic behaviors in school that increased after her mother's release from a residential drug rehabilitation program." Dr. Dreyer also noted that Dr. McGhee's 2021 evaluation

suggested a diagnosis of a generalized anxiety disorder as well as a cannabis use disorder.

{¶ 28} Turning to the HCR-20v3's "present clinical factors," Dr. Dreyer explained that she looked at the factors with reference to the six months immediately prior to the assessment. There are five clinical factors the assessment looks at, and Dr. Dreyer found that one factor was present (recent problems with insight), two factors were partially or possibly present (recent problems with violent ideation or intent and problems with treatment or supervision responses), and two factors were absent (recent problems with symptoms of major mental disorder and instability).

{¶ 29} Dr. Dreyer noted that appellant had very little, if any, insight into her substance abuse issues or her need for treatment to address some of the major difficulties in her life. During her evaluation, appellant "denied the need for further treatment to address her criminal thinking or substance abuse." She had also denied mental health services when she was first placed in prison. While in prison and at WCJDC, appellant "continued to engage in rule-breaking behaviors * * * with little, if any, insight into such." Dr. Dreyer noted that appellant was moved up a security level due to her refusal to comply with rules while she was in prison. Appellant had a total of 20 rule infractions in the ten months she was held in prison.

{¶ 30} Finally, Dr. Dreyer discussed the five future risk management factors that applied to appellant. Dr. Dreyer noted that these factors were "rated with consideration for [appellant] being released [in]to the community." Two of the risk management factors were found to be present (future problems with professional services and plans and problems with her living situation) and three factors were found to be partially or possibly present (future problems with personal support, problems with treatment or supervision

responses, and problems with stress or coping). Appellant would presumably return to the home that she shared with her grandparents and her stepfather. Though appellant had a good relationship with her relatives, she had a history of breaking the rules in their care. Appellant's truancy and drug use were permitted to occur without any real consequences while in her grandparents' care. Dr. Dreyer was also concerned that appellant's grandparents had painted appellant as the victim in the situation and assigned blame to T.D. for appellant's circumstances. Appellant's grandparents felt T.D. was at fault because she brought the LSD and had been over 18 when the incident occurred.

{¶ 31} Dr. Dreyer was also concerned about whether appellant would comply with supervision and treatment requirements. She noted that appellant had immediately gone back to using marijuana after completing a substance abuse course. Appellant had also continued her rule-breaking behavior while in prison and in the WCJDC. In her written report, Dr. Dreyer noted that appellant "has a history of rule-breaking behaviors and criminal thinking, as well as substance abuse. She reported continuing to engage in problematic behaviors in a structured setting (i.e., prison) with no insight into her risk management needs."

{¶ 32} Dr. Dreyer considered the results of the HCR-20v3 assessment in light of the factors identified in R.C. 2152.12(D) and (E). She found that appellant's lack of insight into her need for treatment and change would be a barrier to treatment and would lengthen the amount of time appellant would need for treatment. Dr. Dreyer did not believe appellant would make sustained changes or be rehabilitated in the period of time left before her 21st birthday. She therefore did not think appellant was amenable to rehabilitation within the juvenile system. Her professional opinion was summarized, in relevant part, as follows in her written report:

It is clear that [appellant] has a history of contacts with the Court, with the instant offense representing her most serious charges. She has continued to engage in rule-breaking behaviors since her arrest and incarceration, with little, if any, insight into such. Further, she frankly denied the need for any future treatment or intervention. While she may be in need of further intervention, there is a limited amount of time left for such in the Juvenile Court and her prognosis for sustained change with any intervention is guarded, at best. Thus, given her history and presentation, it does not appear that [appellant] would substantially benefit from further services or intervention within the Juvenile Court system.

* * * It is my professional opinion that given her risk for future violence and reoffending, risk factors, lack of protective factors, age, and history, [appellant] is not amenable to rehabilitation in the juvenile system at this time.

{¶ 33} Dr. Hrinko then testified about his evaluation of appellant. He explained that as part of his evaluation, he conducted a clinical interview with appellant, administered the HCR-20v3 checklist, the MMPI-2-RF test, and JI-R test, reviewed the amenability evaluations conducted by Dr. McGhee and Dr. Dreyer, reviewed records pertaining to the incident in Hueston Woods, reviewed appellant's school records, and reviewed appellant's mental health and institutional records from ODRC, WCJDC, and the Butler County Juvenile Detention Center. With respect to the HCR-20v3 checklist, Dr. Hrinko looked at the same historical factors, present clinical factors and risk management factors that Dr. Dreyer examined, but he reached a different conclusion as to appellant's amenability for rehabilitation or treatment in the juvenile system.

{¶ 34} Dr. Hrinko agreed with Dr. Dreyer that appellant had experienced a lot of trauma in her life. He noted that appellant's mother's drug abuse was a significant source of the early childhood trauma appellant experienced. Appellant also experienced trauma from the long-term "toxic" relationship she had, which began when appellant was in eighth grade and did not end until a few months before the incident in Hueston Woods. Appellant

- 14 -

had described the relationship as abusive and noted that the police had been called to her home at one point.

{¶ 35} Dr. Hrinko explained that appellant began to self-medicate herself through the use of marijuana starting around age 11. As appellant aged, she began to experiment with other drugs, including methamphetamine. Dr. Hrinko was under the impression that the day appellant attacked T.D. was the first time appellant had used LSD. Dr. Hrinko testified that appellant relied upon drugs as a coping mechanism. As a result, "she failed to develop more mature coping skills, such as sharing information, trusting relationships, looking at other ways of coping that a normally developing adolescent would be expected [to use]." He suggested that appellant's emotional development stopped around the time she started using drugs, at age 11.

{¶ 36} Dr. Hrinko believed appellant was in need of "significant services pertaining to her underlying trauma and understanding how her substance use was a way of managing * * * because once she began to address the underlying trauma and developed appropriate, more socially acceptable coping skills, then her ability to avoid substances would be much easier." Dr. Hrinko noted that after appellant was caught with marijuana at school, she was sent to an educational program on substance abuse. Appellant initially did not comply with the rules of that program. However, after learning she would be expelled from school if she did not complete the program, appellant changed her behavior long enough to graduate from the program. Appellant did not, however, make any real changes following the completion of the program. She celebrated her graduation day by using drugs and getting high.

{¶ 37} Dr. Hrinko also noted that appellant had received "brief counseling services" following her mother's death and had been seen at a mental health agency for school

behavior problems. However, appellant had a dismissive attitude and failed to make use of those services or opportunities. Despite noting "[t]here are concerns associated with [appellant's] limited response to treatment/supervision in the past," Dr. Hrinko nonetheless believed appellant's attitude and willingness to engage in services had improved. Appellant never denied her need for treatment to Dr. Hrinko. He believed appellant had gained insight into her use of drugs and was willing to work with a therapist to address her drug use and past traumas. He noted that at one point, while in prison, appellant had reached out and asked for some crisis mental health services. Appellant had also attended approximately 12 therapy sessions since being removed from prison and placed back in the WCJDC. According to Dr. Hrinko, appellant was "appropriately making use" of those appointments to address her feelings on the possible outcomes of the amenability hearing. Although, Dr. Hrinko acknowledged, "there was never any evidence of her beginning to use that opportunity to explore those deeper issues [(i.e., trauma or substance abuse issues)] that underlie this whole situation."

{¶ 38} Dr. Hrinko was aware of appellant's antisocial tendencies, her prior involvement with the juvenile court for truancy, theft, and traffic offenses, and her past refusals to show up for certain court proceedings, which resulted in brief periods of detention by the juvenile court (two three-day periods of detention). He was also aware that appellant had violated multiple prison rules and rules at WCJDC. He acknowledged that appellant's "response to supervision opportunities have been less than stellar." Nonetheless, he did not believe any rules that were violated at WCJDC were from significant behavior problems. He also did not believe appellant's rule violations while in prison were significant. Rather, he believed that the rule infractions appellant were the result of appellant adjusting to her new environment and an "exploitive" relationship with

an older inmate.

{¶ 39} Dr. Hrinko did not believe appellant had a history of fights or aggressive behaviors, outside of the incident involving T.D. However, he admitted on cross-examination that he had not been aware that appellant had received a rule infraction in prison for engaging in a fight with another inmate. He also had not been aware that appellant had punched her school-peers and had once threatened a peer with scissors. When confronted with this information, he indicated that it would "cause him to look at an increase in the severity of her past behaviors," but even considering such information, it did not "carry sufficient weight to cause [him] to completely overhaul his opinion" that she was amenable to rehabilitation within the services available within the juvenile justice system.

{¶ 40} Dr. Hrinko believed appellant's conduct over the six months prior to the hearing indicated she was capable of complying with the rules of juvenile detention and any treatment program. He stated:

> My experience tells me that placed in an appropriate residential type treatment program where there is stability and predictability for at least 12 to 18 months [appellant] would then be in a position to allow her to engage in a therapeutic relationship, receive the support necessary, and explore those issues bringing them to a reasonable understanding within 12 to 18 months to prepare her for what the next phase of her life might have to offer.
>
> * * *
>
> I understand that time is somewhat short given [appellant's] age, but I believe if she was in a secure environment with access to trauma-informed mental health therapy and substance abuse treatment programming, with the emphasis on the trauma-informed mental health therapy, that she could be given the opportunity and I believe would likely make use of that to begin to explore these concepts about trusting relationships, how her past has made it difficult for her to understand what is in her best interest, and to develop

appropriate coping skills that will eventually serve her well upon returning to the community. I believe it would take a minimum of 12 and probably 18 months for that to take full effect because there will be times of progress and regression. It's typical of the treatment process.

Based on the results of the HCR-20v3 checklist, Dr. Hrinko was of the opinion that appellant's "risk for future aggressive and/or inappropriate behaviors is moderate although the risk of imminent violence or serious physical harm is low."

{¶ 41} According to Dr. Hrinko's written report, the MMPI-2-RI assessment indicated appellant had "a significant history of antisocial behaviors" and was "at risk for acting out when bored and [using] abuse mood altering substances." Additionally, there were indicators that suggested appellant "is driven primarily by external motivating factors and may, as a result, be hesitant to engage in treatment activities." Dr. Hrinko expected it would take appellant several treatment sessions before she started getting serious about addressing her underlying trauma and substance abuse issues.

{¶ 42} Dr. Hrinko also administered the JI-R test, which is used to identify different personality types. Though appellant had several behaviors that could fall within a personality disorder marked by antisocial features, Dr. Hrinko did not believe appellant had well-developed antisocial tendencies. He did not think she had a commitment to criminal thinking and behaviors but, rather, could benefit from services to adjust her antisocial attitude. He noted that appellant "views the world in terms of power and control and goes to great effort to control herself, her situations, and others to meet her needs. She is somewhat distrustful of those in authority and benefits from clarity and certainty in her environment." He opined that "she is likely to respond well to introspective therapy" and "[w]hen engaged in such services, she is likely to benefit resulting in significant changes in her overall functioning." Though Dr. Hrinko did not personally know what

residential facility would best lend itself to a placement for appellant, he was confident DYS would be able to identify and arrange an appropriate placement. He therefore opined that appellant was "a good candidate for rehabilitation within the services available within the juvenile justice system and that [appellant] does not pose a significant hazard to the safety of the community."

{¶ 43} Bechard, who has taught appellant at the WCJDC for approximately two-to-three hours per day, five days a week, testified that appellant is one of three detainees over the age of 18 at WCJDC. She is currently focused on obtaining her GED.

{¶ 44} At WCJDC, Bechard helps facilitate two group-based programs, a "Go for the Gold" course aimed at instructing juveniles on building relationships and setting boundaries with others and a drug and alcohol group program where juveniles talk about addiction and learn to set goals and priorities. Bechard does not run either program but is present and helps the counselors who run the programs. Appellant's report card, which detailed her activities at the WCJDC from August 17, 2022 through January 4, 2023, indicated that she had taken 20 hours of Alcohol and Drug Prevention Education, 17 hours of Establishing Healthy Relationships Education through the "Go for the Gold" program, and 8 hours of Anger Management courses. Bechard described appellant as a "willing participant" in those group programs, and he observed her asking thoughtful questions and being supportive of other juveniles. Bechard has never observed appellant act inappropriately with staff and appellant has never been aggressive or violent in his presence.

{¶ 45} Jefferson explained that all female youths committed to DYS are first sent to the Children for Adolescent Services ("CAS"), where DYS conducts a review of any prior psychological evaluations or records pertaining to the juvenile and an independently

licensed therapist conducts a mental health assessment so that DYS can determine what services, beyond those ordered by a judge, should be offered to the juvenile. Female juvenile delinquents are either kept at CAS or sent to one of three stepdown facilities: Applewood Center, Osterland, or Buckeye Ranch. All three stepdown facilities are lock-down facilities. Osterland, however, is the only facility other than CAS that houses delinquents who are over the age of 18. All facilities are set up to offer cognitive behavioral therapy, dialectical behavioral therapy, substance abuse treatment, intensive mental health treatment, trauma therapy, and occupational therapy. All juveniles receive cognitive behavioral therapy and dialectical behavioral therapy. Other therapies are provided if ordered by the juvenile court or if the juvenile's intake information indicated the juvenile would benefit from receiving the services. For instance, Jefferson explained, if a juvenile's intake information indicated she had a history of trauma in her life, the juvenile would be provided with trauma-informed therapy.

{¶ 46} Jefferson explained that all female juvenile delinquents committed to DYS are on a mental health caseload. Those housed in CAS meet weekly with a mental health provider and with an occupational therapist. Those housed at one of the stepdown facilities meet with a mental health provider three times a week. They also meet with a "life skills" group three times a week, where they are taught daily living skills.

{¶ 47} Jefferson testified that most youth "spend at least 18 months" in DYS where they receive ongoing therapy and services. Even those delinquents who deny committing a crime or deny that they need treatment must participate in group therapy. Jefferson stated that 12 to 18 months would be enough time to complete substance abuse treatment and anger management programming. While a juvenile is committed to DYS, there are monthly meetings with the juvenile's treatment team to discuss the juvenile's progress

and any appropriate treatments. The treatment team includes Jefferson and the juvenile's parents, mental health providers, parole officers, and social workers.

{¶ 48} Jefferson explained that a juvenile who has completed treatment and been approved to re-enter the community before they attain the age of 21 is placed on parole upon release from DYS. For those juveniles who do not complete treatment, they are held at a DYS facility until they attain the age of 21. At that time, they are released from DYS's custody and encouraged to participate in a voluntary mentorship program. They are also encouraged to participate in voluntary programs that assist with housing and schooling. However, because the juvenile court loses jurisdiction when a juvenile turns 21 years old, DYS cannot make participation in the mentorship program or any other program mandatory.

{¶ 49} The juvenile court took the forgoing testimony and evidence under advisement. On May 18, 2023, the juvenile court issued a decision finding that appellant was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that she be subject solely to adult sanctions. In reaching this conclusion, the juvenile court considered the factors set forth in R.C. 2152.12(D), which favored transfer to adult court, against those factors set forth in R.C. 2152.12(E), which weighed against transfer. The court found that none of the factors in R.C. 2152.12(E) weighing against transfer applied, but that six factors in R.C. 2152.12(D) favoring transfer applied. The court concluded that the "factors in favor largely outnumber the factors against transfer and the expert that ultimately recommended transfer was far more credible." The juvenile court therefore sustained the state's objection to a SYO disposition and ordered that appellant be transferred back to the adult court for the imposition of her adult sentence.

{¶ 50} After appellant was transferred back to the common pleas court, the court reinstated the sentence it originally imposed—an indefinite prison sentence of a minimum of six years and a maximum of nine years, payment of court costs, and an order of restitution to T.D. in the amount of $3,303.19. Appellant timely appealed from the juvenile court's amenability determination and from the sentence imposed by the common pleas court. This court consolidated the appeals. *See State v. Rojas*, Preble CA2023-06-006 and CA2023-07-007 (July 27, 2023) (Entry of Consolidation).

{¶ 51} Appellant now raises the following as her sole assignment of error:

{¶ 52} THE JUVENILE COURT ABUSED ITS DISCRETION WHEN IT DETERMINED THAT [APPELLANT] WAS NOT AMENABLE TO TREATMENT IN THE JUVENILE SYSTEM, IN VIOLATION OF R.C. 2152.12(B); 2152.121; FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, AND ARTICLE I, SECTION 10, OHIO CONSTITUTION.

{¶ 53} Appellant argues the juvenile court abused its discretion in finding she was not amenable to care or rehabilitation in the juvenile system. She contends that the evidence introduced at the amenability hearing demonstrated that she could benefit from trauma-informed treatment at DYS, that there was sufficient time for her to be rehabilitated in the juvenile system before she reached age 21, and that the safety of the community would be adequately protected by a juvenile disposition, especially as a SYO disposition provided an extra layer of protection. She further contends that the juvenile court erred in crediting Dr. Dryer's opinion over those of Dr. Hrinko and Dr. McGhee.

{¶ 54} In determining whether a child is not amenable to care or rehabilitation within the juvenile court system and whether the safety of the community may require that the child be subject solely to adult sanctions, a juvenile court "shall consider the factors

listed in division (E) of [R.C. 2152.12] as factors indicating that the [prosecutor's] motion [for transfer to the adult court] should not be granted, and shall consider whether the applicable factors listed in division (D) of that section outweigh the applicable factors listed in division (E) of that section."  R.C. 2152.121(B)(3)(b).  "If the juvenile court at the hearing finds that the child is not amenable to care or rehabilitation within the juvenile system or that the safety of the community may require that the child be subject solely to adult sanctions, the court shall grant the motion."  *Id.*

{¶ 55}  The state bears the burden of persuasion when asking the juvenile court to transfer the case to adult court, though "the state need not produce affirmative evidence of nonamenability."  *State v. Nicholas*, 171 Ohio St.3d 278, 2022-Ohio-4276, ¶ 57.  "[A] juvenile court's decision to exercise its discretion to transfer a juvenile to adult court must be supported by a preponderance of the evidence."  *Id.* at ¶ 35.  "An appellate court reviews a juvenile court's determination regarding a juvenile's amenability to rehabilitation or treatment in the juvenile system under and abuse-of-discretion standard [of review]."  *Id.* at ¶ 22.  "If there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion."  *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 401 (1998).

{¶ 56}  Pursuant to R.C. 2152.12(D), the factors that favor transfer to adult court include the following:

> (1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.
>
> (2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.
>
> (3) The child's relationship with the victim facilitated the act

charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

R.C. 2152.12(D)(1)-(9).

{¶ 57} The factors that weigh against a transfer to adult court are set forth in R.C. 2152.12(E) and including the following:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent

child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety

R.C. 2152-12(E)(1)-(8).

{¶ 58} "No one factor under R.C. 2152.12(D) or (E) is outcome determinative." *State v. Jordan*, 8th Dist. Cuyahoga No. 111547, 2023-Ohio-311, ¶ 11. "If, by a preponderance of the evidence, the trial court concludes that the factors in favor of the transfer outweigh those against, the statutory analysis is satisfied." *Id.*, citing *Nicholas*, 2022-Ohio-4276 at ¶ 35. The record reflects that the juvenile court properly considered whether appellant was amenable to care or rehabilitation in the juvenile system, weighing the statutory factors that favored transfer to the adult court against the statutory factors that favored the juvenile court's retention of jurisdiction. The juvenile court made six findings that weighed in favor of transfer: (1) T.D. suffered physical harm and psychological harm, R.C. 2152.12(D)(1); (2) appellant's relationship with T.D. facilitated the charged acts, R.C. 2152.12(D)(3); (3) at the time of the incident, there was a warrant for appellant out of the Butler County Juvenile Court for failing to attend a court date and appellant had previously been involved with the Butler County Juvenile Court for issues of truancy, substance abuse, theft, and driving without a license, R.C. 2152.12(D)(6); (4) the results of previous juvenile sanctions and programs indicated that rehabilitation of appellant would not occur in the juvenile system, R.C. 2152.12(D)(7); (5) appellant was emotionally, physically, and psychologically mature enough for the transfer to adult court

- 25 -

as she had demonstrated "street smarts" and "advanced maturity" in prison by entering into a romantic partnership and procuring items that did not belong to her, R.C. 2152.12(D)(8); and (6) there was not sufficient time to rehabilitate appellant within the juvenile system as there was just over 17 months available in the juvenile system, the experts had suggested appellant would need a minimum of 12 to 18 months in treatment to have a chance at being successful, and there were doubts as to appellant's insight into her need for treatment. We find that the testimony and exhibits entered into evidence at the amenability hearing support these findings.

{¶ 59} We further find, contrary to appellant's assertions, that the trial court considered the factors set forth in R.C. 2152.12(E) that weighed against transfer to the adult court, as well as the various traumas that appellant has faced, in making its amenability determination. Though the juvenile court did not find that any of the factors in R.C. 2152.12(E) weighed against transfer to the adult court, it did note in its discussion of factor (E)(1) that T.D. had planned the camping trip and brought the LSD and marijuana on the trip. The court found, however, in its discussion of factor (E)(3), that appellant had voluntarily taken the LSD and had not been acting under the negative influence or coercion of another at the time of the attack. In considering appellant's emotional, psychological, and physical maturity, the court noted that Dr. McGhee's September 2021 report had discussed appellant's immaturity. However, the court noted that the report was written when appellant had only been 17 years old. At the time of the amenability hearing, appellant was 19 and one-half years old. Dr. Hrinko had found that there were no indications that appellant was childish or immature in her thoughts and actions. Dr. Hrinko did indicate, however, that appellant's coping skills were "basically at that of an eleven (11) year old" due to starting her drug use at that stage. The juvenile court indicated that

while that might cause one to question her emotional and psychological maturity, appellant's actions while in prison indicated she was mature. The court stated:

> [Appellant] has been in the adult system and she was able to secure items that were not hers * * * and found a partner, whether abusive or not. (She told one expert that it was an abusive relationship, although he was not sure there was actually abuse and though that it was maybe more of a manipulation. [Appellant] did not tell the other evaluator anything negative about the prison relationship.) Such behavior points to some "advanced" maturity insofar as "street smarts."

{¶ 60} As for factor (E)(7), the court found that appellant did not have an intellectual disability. Rather, she was in the low-average to average intellectual range. She likewise had not been diagnosed with a mental illness, though Dr. Hrinko had indicated a "reasonable likelihood that she suffers from a substance use disorder." Both Dr. Hrinko and Dr. Dreyer believed appellant exhibited antisocial behaviors, which the juvenile court took into consideration.

{¶ 61} The juvenile court also considered the amount of time appellant had left in the juvenile court system before she turned 21, whether that time was sufficient to rehabilitate her, and whether the level of security available in the juvenile system provided a reasonable assurance of public safety under R.C. 2152.12(E). At the time the court issued its amenability decision on May 18, 2023, appellant had 17 and one-half months left before her 21st birthday. The experts believed appellant would need a minimum of 12-18 months of treatment to have a chance at treatment being successful. Even if appellant was immediately connected with appropriate services and was genuinely interested in getting better, there were concerns that her traumatic history and her personality traits might make her hesitant to engage in treatment activities.

{¶ 62} Furthermore, there were concerns about whether appellant had insight into

her need for treatment. Though Dr. Hrinko believed appellant had recently gained insight into her need for treatment, Dr. Dreyer felt differently. Dr. Dreyer believed appellant lacked insight, as evidenced by appellant's denial of her need for treatment during her amenability evaluation with Dr. Dreyer and appellant's refusal of mental health services when first placed in prison. As the juvenile court noted, "treatment to assist one in gaining insight * * * takes more time."

{¶ 63} The juvenile court indicated that while it was not concerned about public safety while appellant was housed in a juvenile facility such as DYS, as "[s]uch are locked facilities," it was concerned for public safety "if [appellant] [was] released at twenty-one (21) without having completed the necessary treatment." The juvenile court found that given appellant's history involving violence, which included a history of violence against school peers, a fellow prisoner, and T.D., her pattern of disregarding rules, and her limited insight into her need for treatment, appellant's "reintroduction to general society without competing the extensive services necessary to manage her long-standing trauma and substance abuse is concerning from a public safety standpoint."[5]

{¶ 64} From the record before us, we find that the juvenile court's findings and its discussions of the applicable factors under R.C. 2152.12(D) and (E) are supported by the preponderance of the evidence. Though appellant may disagree with the weight afforded to the relevant statutory factors, this is insufficient to show that the juvenile court's findings were based on erroneous facts or an unreasonable, arbitrary, or unconscionable application of R.C. 2152.12. *See In re M.A.*, 12th Dist. Brown No. CA2018-07-005, 2019-

---

5. Appellant argues the incidents of violence against her school peers are of limited relevance because they were committed around 2010 and 2011, when she was around 8 years old and was facing trauma in her life. Even though they occurred when appellant was much younger, the incidents still demonstrate a history of violence and aggressive behaviors. Dr. Dreyer and the juvenile court were therefore permitted to consider these events when looking at appellant's amenability in the juvenile system and the safety of the community.

Ohio-829, ¶ 33; *State v. Walker*, 8th Dist. Cuyahoga No. 112633, 2024-Ohio-729, ¶ 29-31; *State v. Cunningham*, 6th Dist. Lucas No. L-21-1136, 2022-Ohio-3497, ¶ 100-101.

{¶ 65} We further find no error in the juvenile court's decision to credit Dr. Dreyer's expert opinion over that of Dr. Hrinko's or Dr. McGhee's opinions. Dr. McGhee's evaluation was out-of-date, as it was conducted in August of 2021, when appellant was only 17 years and 9 months old. In forming her opinion that 17-year-old appellant was amenable to care or rehabilitation within the juvenile system, Dr. McGhee did not have access to information about appellant's continued lack of insight, her refusal to accept mental health services in prison, or her continued antisocial behavior while in prison and WCJDC. As for Dr. Hrinko's written opinion, it failed to take into account certain facts, such as appellant's violence against her school peers, that she had been involved in a fight in prison, and that her use of LSD on the day of the attack on T.D. was her second time using the drug. As the court noted,

> Dr. Hrinko did not realize * * * that [appellant] had other incidents of violence. He did not know that she told the other two experts that she had used LSD before. He also did not include that there had been a fighting incident in prison. He claims such did not sway him from the position that [appellant] should not be transferred back to adult court, but his shortcomings are more concerning than Dr. Dreyer's [typos in her written report].

The court was further troubled by Dr. Hrinko's "weighing" of the HCR-20v3 factors, which Dr. Dreyer had indicated were only supposed to be marked as either being present, partially present or possibly present, or absent. Finally, the court indicated "[a]nother concerning part of Dr. Hrinko's report [was] his discussion (and report) of the incident [involving T.D.] from [appellant's] perspective. Such is contrary to the Ohio Revised Code." *See* R.C. 2152.12(F)(4) ("No report of an investigation conducted pursuant to division [C] of this section shall include details of the alleged offense as reported by the

child"). Given these circumstances, we find that the juvenile court did not abuse its discretion in finding Dr. Dreyer's expert opinion more credible and affording more weight to her testimony.

{¶ 66} Appellant also suggests that the juvenile court failed to give proper weight to the type of treatment available to appellant if she was sent to a DYS facility. In summarizing Dr. Hrinko's testimony as it related to factor 2152.12(D)(7), the trial court stated, in relevant part, that "[t]he defense expert believes [appellant] could be rehabilitated in the juvenile system, but also indicated that he did not know anything about the placement(s) available. He also acknowledged that he did not know what specific treatment(s) had been offered [to] her." Appellant contends that by making this statement, the court "discounted [DYS programming's] impact because the defense expert wasn't familiar with DYS's programming." Appellant contends this resulted in reversible error and, in support of her argument, cites to *State v. Nicholas*, 2022-Ohio-4276.

{¶ 67} In *Nicholas*, the juvenile court granted the state's motion to transfer Nicholas to adult court based on its finding that DYS did not have the "'resources or capability' to treat dissociative-identity disorder, which requires long-term intensive treatment with 24-hour-a day and 7-days a week supervision and support." *Id.* at ¶ 15. However, there was no evidence to support the finding that Nicholas required that type of care. Rather, such a finding contradicted the expert testimony offered at the amenability hearing. The Supreme Court reversed, stating in pertinent part the following:

> Here, the juvenile court's decision that Nicholas is not amenable to treatment and rehabilitation in the juvenile system was based on a perception that DYS lacks the necessary resources to treat Nicholas's mental illness—a perception that is not only unsupported by the record but that is, in fact, *contrary* to the reality established by the record. Absent that misperception, the juvenile court's amenability determination is not supported by the preponderance of the

evidence and constitutes an abuse of discretion.

(Emphasis sic.)  *Id.* at ¶ 56.

{¶ 68} Here, unlike in *Nicholas*, the juvenile court did not find that DYS lacked the resources to treat appellant or ignore testimony offered by Jefferson about the type of treatment available to appellant if placed in a DYS facility.  Rather, the court clearly considered Jefferson's testimony and the options for treatment at DYS, but found, in light of Dr. Dreyer's evaluation and the limited amount of time left before appellant's 21st birthday, that appellant was not amenable to rehabilitation in the juvenile system.  Nothing about the court's determination was arbitrary, unreasonable, or unconscionable.

{¶ 69} Finally, appellant argues the trial court should have considered the "increased options for accountability" that a SYO disposition provided the court if it would have denied the state's motion and imposed a juvenile disposition.  However, the Ohio Supreme Court expressly held that "a juvenile court need not consider all potential juvenile dispositions, including a serious-youthful-offender disposition, when balancing the factors weighing in favor of and against transfer."  *Id.* at ¶ 57.  The juvenile court, therefore, did not error in electing not to consider an SYO disposition in its weighing of the factors set forth in R.C. 2152.12(D) and (E).

{¶ 70} Accordingly, following our review of the record, we find no abuse of discretion in the juvenile court's determination that appellant was not amenable to rehabilitation in the juvenile system.  The record clearly reflects that the juvenile court weighed the appropriate statutory factors listed in R.C. 2152.12(D) and (E) and there is competent, credible evidence in the record to support the court's findings.  Appellant's sole assignment of error is, therefore, overruled.

**{¶ 71}** Judgment affirmed.[6]

S. POWELL, P.J., and M. POWELL, J., concur.

---

6. Appellant's sole assignment of error is related to the appeal in Case No. CA2023-06-006, regarding the decision in Preble County Juvenile Court Case No. 20212074. Appellant filed a separate appeal in Case No. CA2023-07-007, pertaining to the common pleas court's sentencing on the felonious assault conviction in Case No. 21CR013712. The appeals were consolidated. Appellant's brief did not raise any assignments of error challenging the proceedings of the common pleas court or the sentence imposed by the common pleas court. Since we do not have an assignment of error to resolve relating to Case No. 21CR013712, the trial court's judgment in that case is also affirmed. *See, Ford v. Crawford*, 2d Dist. Montgomery No. 28717, 2021-Ohio-454, ¶ 4.