[Cite as *State v. Coleman*, 2025-Ohio-773.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-24-1033

    Appellant                                Trial Court No.  CR0202302435

v.

Joshua Coleman                           **DECISION AND JUDGMENT**

    Appellee                                 Decided:  March 7, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Charlyn Boyland, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal by appellant, Joshua Coleman, from the January 12, 2024
judgment of the Lucas County Court of Common Pleas, General Division, after the Lucas
County Court of Common Pleas, Juvenile Division, transferred jurisdiction over Coleman
to the general division.  On appeal, Coleman challenges the juvenile court's August 1,
2023 determination that he is not amenable to rehabilitation within the juvenile system.
For the reasons that follow, we affirm.

**{¶ 2}** Coleman sets forth one assignment of error:

The juvenile court abused its discretion when it determined that Joshua Coleman was not amenable to treatment in the juvenile court system, in violation of R.C 2152.12(B); Fifth and Fourteenth Amendments to the U.S. Constitution; Article I, Section 10, Ohio Constitution; and *State v. Nicholas*, 171 Ohio St.3d 278, 2022-Ohio-4276, 217 N.E.3d 745. (8.1.2023 Judgment Entry).

## Background

**{¶ 3}** On the morning of January 8, 2023, Coleman, then 15 years old, was with D.G., who was also 15 years old, and another juvenile, T. The three juveniles were walking in an alley in Toledo, Ohio, when Coleman put a gun to the back of D.G.'s head and fired, killing her. D.G.'s body was found the next day.

## Juvenile Court Case

**{¶ 4}** On January 13, 2023, a complaint was filed in the Lucas County Court of Common Pleas, Juvenile Division, alleging that Coleman was a delinquent child for knowingly causing physical harm to another by means of a deadly weapon and having a firearm while committing the offense and using it to facilitate the offense.

**{¶ 5}** On January 17, 2023, the State moved for discretionary transfer of jurisdiction for the purpose of criminal prosecution to the Lucas County Court of Common Pleas, General Division, pursuant to R.C. 2152.10(B) and 2152.12(B).

**Probable Cause Hearing**

**{¶ 6}** On April 20, 2023, the juvenile court conducted a probable cause hearing at which Toledo Police Department ("TPD") Detective Andrew Crisp testified to the

2.

following. D.G. was initially reported missing and Crisp took part in investigating her whereabouts. Det. Crisp recalled that another detective was told by D.G.'s mother that the mother received a message from juvenile, J.S., that D.G. had been shot, and the next day the mother or D.G.'s stepfather received a call or message from Coleman saying that D.G. had been shot in the head and was in an alley. Det. Crisp was then advised by this other detective that D.G. may have been shot and her body may be in north Toledo.

{¶ 7} On January 9, 2023, Det. Crisp searched an alley between Page and Peck streets and located D.G.'s body. D.G. was face-down, "laying on her stomach, kind of on her side. She was wearing a yellow jacket with black leggings and red boots. Her hood was up. Both of her . . . hands were in her front . . . jacket pockets. We could see a cell phone in her hand. We couldn't see any trauma other than that." There were no signs of a struggle in the alley or that D.G. was moved from another location to the alley.

{¶ 8} Det. Crisp became the lead investigator of D.G.'s death and through witness interviews and search warrants on phones and Facebook, a timeline was established of where D.G. was, and with whom, on Saturday night, January 7, 2023, into Sunday morning, January 8, 2023. On Saturday night, D.G. was with Coleman at juvenile, R.'s, house in the area of Manhattan and Stickney. D.G. and Coleman split ways; D.G. and some friends got a ride to a house in south Toledo. Around midnight, D.G. and two female friends were given a ride to west Toledo, Dorr and Reynolds area, by one friend's "weed man." D.G. and the two friends were given another ride by the weed man and D.G. was dropped off at Coleman's house at about 4 a.m.; the friends and weed man left.

3.

Det. Crisp said that D.G. "even sent a screen shot of her ETA to Josh Coleman's address. I believe it said 4:02 AM was the ETA."

{¶ 9} Det. Crisp also learned from witness interviews and through "Facebook messages to [Coleman] himself . . . that [Coleman] and [D.G.] were in some sort of argument." D.G. wanted to stay at Coleman's house, "she was sleepy. . . Josh appeared to be getting her to leave. There was mention that [Coleman's] mom was yakking, . . . was yelling at him . . . It sounded like [D.G.] was being kicked out of Mr. Coleman's house by his mom and dad who were unhappy with him having any person in the house."

{¶ 10} At about 7 a.m. on Sunday morning, D.G. and Coleman left Coleman's house and went to T.'s home on Page, at which time D.G. "was sending Facebook messages to her friends, the juvenile witnesses, stating I'm going to be coming to your house. They said okay. She appeared to be trying to get a ride either from [Coleman's] mom or aunt[.] But her messages ended. . . . The last message that [D.G.] sends is at 7:04 a.m. She says, I'm on the way. I think that's when they say come to the window, and that's it."

{¶ 11} Det. Crisp interviewed Coleman who said the last time he saw D.G. was on Friday, January 6, when Coleman was walking to a carryout in the area of Bancroft and Lagrange, and he saw D.G. and they exchanged a few words. Coleman stated that on the night of January 7, his mom gave him a ride to the S. house,[1] where Coleman stayed all night, smoking and playing video games with little kids there. On January 8, Coleman

---

[1] Juvenile, J.S., lived at the S. house.

said he woke up, stayed at the S. house, smoked, played video games again, played with the kids, and his mom came and picked him up on January 9th.

{¶ 12} Coleman said he did not have his own phone, it had been broken two months prior, so he used his mother's phone, but Coleman's mother provided Coleman's phone number to police. That phone number was used on the search warrants. Det. Crisp obtained search warrants for social media accounts related to Coleman and D.G. and found Coleman used one of his Facebook accounts when he was in contact with D.G. Saturday night into Sunday morning. "There are many, many conversations on there. . . [S]he's asking to come to his house, and he says yes. She even asked for the address . . . and he gives it to her, and her phone showing that they were [e]n route, the ETA of 4:02 AM." Coleman deleted all of his messages with D.G. after she tried to find a ride to leave Coleman's house.

{¶ 13} Det. Crisp also discovered that Coleman tried to refocus blame for D.G.'s murder by messaging or calling D.G.'s mother and stepfather saying that Coleman heard D.G. had been shot and was dead, and T. did it.

{¶ 14} Det. Crisp determined T. was a witness who lived on Page, and Coleman knew T. for years. "They were associates . . . [T. had] a Facebook page of [R.T.] . . . . Through search warrants . . . [Det. Crisp learned that] a . . . Facebook page was made . . . spelled [RD.T.] . . . . from Joshua Coleman's phone number on Monday the 9th, which is the day we discovered [D.G.'s] body. . . . Coleman's phone was connected to the [S. residence's] Wi-Fi . . . when that account was made. Then there was one post made from

5.

that account saying that [D.G.] got shot . . . we got shot at, she was in the way, and she got shot." Coleman made that post from his phone.

{¶ 15} In T.'s interview with Det. Crisp, T. said on Sunday morning, January 8, Coleman called T.'s mother's phone and asked T. to come over, but T.'s mother said T. was not allowed to leave. Later that morning, around 6:30 to 7 a.m., Coleman and D.G. arrived at T.'s house on Page, where the trio stayed for a short time. The trio left; Coleman said he had to go back to his house to get something he forgot. The trio walked down the alley, a cut-through from Page to Coleman's house, with D.G. walking in front of Coleman, and T. behind Coleman. T. saw Coleman pull out a gun from his, Coleman's, waistband, run up behind D.G. and shoot her once in the back of the head. T. heard D.G. gasp for air and saw her fall. Coleman ran towards his house, while T. vomited then ran home.

{¶ 16} T. said he walked behind Coleman because Coleman made several threatening remarks to T., pointed a gun at T., stole things from T. many times, and held T. at gunpoint to where T. was afraid for his life. T. did not like having Coleman behind him anytime because Coleman often had a gun. T. did not know that Coleman had a gun on Sunday morning until Coleman pulled it out in the alley. T. said Coleman seemed to be upset that D.G. was talking to other people on her phone, not sharing who she was speaking with, hiding something in her phone and not showing Coleman messages. T. was not told by Coleman that D.G. was going to set Coleman up for something.

6.

{¶ 17} T. described Coleman's gun as silver, with a silver slide, black handle and longer barrel; T. believed it was semiautomatic. Coleman's gun was never located. Through juvenile witnesses, Det. Crisp learned that Coleman told a male friend that D.G. was shot with a small gun, a deuce-deuce, which is a .22 caliber gun.

{¶ 18} On January 10, 2023, Det. Crisp received word that Shot Spotter showed a single gunshot was fired on January 8, 2023, at 7:33 a.m. Shot Spotter is a gunshot detection system which picks up sounds, usually gunshots, then dispatch sends out crews to where the gunshots were detected.

**Probable Cause Finding**

{¶ 19} On April 28, 2023, the juvenile court found that Coleman was 15 years old at the time of the killing and there was probable cause to believe he committed the acts charged, which were murder with a firearm specification ("spec") and felonious assault with a firearm spec. The court further found if the acts had been committed by an adult, they would be felonies. The court ordered an investigation and an amenability hearing to decide whether Coleman was amenable for services in the juvenile system.

**Amenability Hearing**

{¶ 20} On July 10, 2023, the juvenile court held an amenability hearing, at which John Neer, Ph.D., an expert in the area of clinical psychology, testified to the following. He met with Coleman on May 18, 2023, for 70 minutes and conducted a psychological evaluation regarding a possible transfer as an adult. Dr. Neer testified they talked about Coleman's current living situation, childhood, issues of mental illness, substance abuse,

7.

medical issues, goals, and how he would like to move forward in his life. Coleman indicated his focus was sports, staying out of trouble and graduating from high school.

{¶ 21} With respect to Coleman's mental health, Coleman did not acknowledge a lot of symptoms, but did discuss an incident where he witnessed a cousin who had died, which did seem to have some impact. Coleman presented as very stable, and the doctor did not "really have a whole lot to work with as far as . . . providing a . . . diagnosis of a major mental illness." Coleman reported having a history of ADHD, but Dr. Neer did not have any documents regarding the ADHD. As to Coleman's maturity level, based on the doctor's interaction with him, the doctor did not recognize any major issues of immaturity. Dr. Neer thought Coleman "was fairly well spoken and polite and courteous, and there was nothing impulsive or immature as far as his demeanor" when they met.

{¶ 22} Concerning Coleman's family relationships and education, there were some unique things, but nothing stood out that was significant. Coleman denied having an IEP or any special education, and initially talked about how school was not going so badly, and he loved sports. Later, Coleman mentioned he was ineligible to play football and basketball due to poor grades. Dr. Neer's impression was Coleman was intellectually stable and had no intellectual disability.

{¶ 23} Regarding medical trauma, Coleman had a mild concussion and one episode of a seizure eight years prior. With respect to criminal charges, Coleman denied having a history of criminal charges or delinquency issues, nor was the doctor aware of any. Coleman stated that he tried cannabis about 20 times. Dr. Neer diagnosed Coleman

8.

with cannabis use disorder, and that was all; Coleman did not have any personality disorder.

{¶ 24} The doctor opined that "[i]f the Court is interested in treatment, I do believe that [Coleman] would benefit from receiving treatment as far as dealing with things from the past as far as setting goals and . . . learning to make positive decisions[.]" Dr. Neer clarified that "I wouldn't say I have the opinion that he should stay in the -- in the juvenile system. I would say if the Court is interested in treatment, he would benefit from that."

{¶ 25} Dr. Neer was asked and agreed that "[f]or a 15-year[-]old [Coleman's] quite mature. He's quite intellectually capable. He's mentally stable. And, again, because you did not qualify or quantify whether or not his current psychological state would only apply to his success in the juvenile system, all of those things that you find in his favor could indicate that he could be quite successful in the adult system, fair enough?"

{¶ 26} The juvenile court noted that the social history and investigative report completed by Hayley Kobe, as well as other reports, including the Court Diagnostic and Treatment Center report, were a part of the record.

**Amenability Finding**

{¶ 27} On August 1, 2023, the juvenile court filed its judgment entry transferring jurisdiction to the trial court. The juvenile court took into consideration the relevant factors in favor of transfer in R.C. 2152.12(D), which were (1), (3), (5), (8) and (9), as

9.

well as other relevant factors, which included the facts presented at the probable cause hearing demonstrating Coleman's calculated behavior to cause D.G.'s death by discharging the firearm at close range once to the back of D.G.'s head.

{¶ 28} The juvenile court noted that a Y-SB-Woodward Treatment Plan, dated June 6, 2021, stated Coleman engaged in unsafe behavior with guns and had a history of homicidal ideation. The court also observed Dr. Neer opined, in the June 7, 2023 Court Diagnostic & Treatment Center Report that he authored, that to a reasonable degree of professional certainty, Coleman could benefit from rehabilitation/treatment through the juvenile justice system, and Dr. Neer testified at the amenability hearing that Coleman could benefit from rehabilitative treatment through the juvenile justice system and the adult system. The court noted the doctor further testified that Coleman denied being affiliated with a gang, but Coleman reported that he associated with gang members and committed crimes with them, he did not regularly attend school in the previous two years and when he did go to school, he had behavioral issues such as failing to follow directions and fighting.

{¶ 29} In addition, the court took into consideration the factors in R.C. 2152.12(E) and other relevant factors against transfer, specifically (5), and also that Dr. Neer stated in his report that Coleman had Cannabis Use Disorder, in remission in a controlled environment and post-traumatic stress disorder ("PTSD") symptoms. The court further considered that Coleman had been meeting regularly with a person from a church while

10.

in detention, and Coleman expressed that he would like to address behavior change, finish high school, and get a job.

{¶ 30} Based on its consideration of the above factors, the juvenile court found the applicable factors under R.C. 2152.12(D) and other relevant factors outweighed the applicable factors and other relevant factors in R.C. 2152.12(E) and further found that Coleman was not amenable to care and rehabilitation within the juvenile system, and the safety of the community may require that he be subjected to adult sanctions.

## Adult Court Case

{¶ 31} In September 2023, the Lucas County Grand Jury returned an indictment charging Coleman with one count of felonious assault, with a firearm spec, and one count of murder, with a firearm spec. Coleman was arraigned and entered a plea of not guilty.

{¶ 32} On January 12, 2024, Coleman withdrew his not guilty plea and entered a guilty plea to a reduced charge of one count of murder. In consideration for the guilty plea, the felonious assault count and the firearm specs were dismissed at sentencing. The trial court accepted Coleman's guilty plea upon finding that he entered the plea knowingly, intelligently, and voluntarily. The court found Coleman guilty and sentenced him to a prison term of 15 years to life. Coleman timely appealed.

## Assignment of Error

**Coleman's Arguments**

{¶ 33} Coleman argues that the Ohio legislature, with the discretionary transfer system, determined that for younger teenagers, "the facts of the offense alone are not

enough to transfer the child to juvenile court." Rather, the juvenile court must assess the whole child to determine if that child is amenable to the dispositional options available to the juvenile court, and the amount of time remaining in the juvenile court's jurisdiction. Coleman maintains that pursuant to *Nicholas*, 2022-Ohio-4276, at ¶ 54, "[t]he question of a juvenile's amenability to care and rehabilitation in the juvenile system is one of the juvenile's rehabilitative potential[.]" Coleman submits the ultimate question for the juvenile court with a discretionary transfer is whether the child is amenable to rehabilitation in the juvenile system while ensuring community safety. R.C. 2152.12(B).

{¶ 34} Coleman contends that the murder of a teenager by a teenager is an extraordinary event, but the amenability determination is independent of factual guilt; it is a recognition that children who make harmful decisions can be rehabilitated in the juvenile system. He submits that he has never been adjudicated delinquent, and no rehabilitative efforts were ever attempted. He notes the court-appointed evaluator believed that Coleman "would likely respond well to a treatment/rehabilitative process," and Coleman asserts there were nearly six years for rehabilitation to happen.

{¶ 35} Coleman argues the juvenile court's transfer decision belies the record and the evidence. He notes he turned 15 years old about one month before the act, and it was his first case in the legal system. He contends the juvenile court's decision referred to reports from Woodward school regarding behavior and treatment plans, which were not mentioned at the amenability hearing and "were not reflective of unfollowed juvenile court orders."

12.

{¶ 36} Coleman asserts the juvenile court probation assessment showed he was at a moderate level of risk. He scored in the low range for: (1) juvenile justice history; family and living arrangements, "meaning that he has strengths in his family supporting his change, family engagement, family participation in treatment, family stability, and no neglect/abuse history"; and (2) values, beliefs, and attitudes, meaning he has strengths in wanting to change and in expressing support for a pro-social lifestyle. He scored in the moderate range for: (1) education and employment, as he had not obtained his high school diploma and had no previous employment experience, but he was only 15 years old and had goals to graduate high school, attend college and pursue a career as a construction worker, counselor or coach; and (2) substance abuse, mental health and personality, with barriers including significant mental health issues and managing anger. Lastly, he scored in the high range for: (1) peers and social support network; and (2) pro-social skills, meaning that he had barriers in managing his own behavior, being motivated to learn new skills, showing age-appropriate skills and lacking pro-social models.

{¶ 37} Coleman claims in the areas where he scored moderate or high, he showed motivation to participate in programming and treatment and demonstrated insight about where he would need to make changes. He contends he is motivated to stop using substances, does not have a long substance use history, has a sober support network, is motivated for treatment, and he has a positive attitude towards psychotropic medication. Yet, he has never been offered or ordered to attend skill development programming, substance abuse treatment, anger management classes, mentoring or counseling.

13.

{¶ 38} Coleman submits he deserves an opportunity for rehabilitative efforts. He argues he could have been committed to DYS until he was 21 years old, nearly six years in the juvenile court's jurisdiction to rehabilitate him, and the SYO (serious youthful offender) dispositional scheme under R.C. 2152.14 allows the juvenile court to invoke the adult portion of a person's sentence, which provides a measure of accountability past age 21.

{¶ 39} Coleman insists the juvenile court abused its discretion by failing to provide sound reasons as to why it could not rehabilitate him, and the evidence demonstrated that he was amenable to the many untested options available.

**The State's Arguments**

{¶ 40} The State argues Coleman's guilty plea bars any claim of an appealable nonjurisdictional error which allegedly occurred in the juvenile court system which precluded him from entering a knowing and voluntary plea.

{¶ 41} The State asserts that even if the jurisdictional issue is not considered, the juvenile court's amenability finding was supported by a preponderance of the evidence in the record and should be affirmed. The State details how the relevant factors in R.C. 2151.12 (D) and (E), and other factors, applied to Coleman, which the juvenile court considered.

14.

**Analysis**

**Waiver Issue**

{¶ 42} At the outset we note that the State argues Coleman's guilty plea bars any claim of an appealable error except that the error precluded him from entering a knowing and voluntary plea. In support, the State cites, inter alia: *State v. Kelley*, 57 Ohio St.3d 127 (1991), paragraph two of the syllabus; *State v. Ketterer*, 2006-Ohio-5283, ¶ 105; *State v. Powell*, 2021-Ohio-200, ¶ 34 (4th Dist.); and *State v. Zarlengo*, 2021-Ohio-4631, ¶ 46 (7th Dist.). The State recognizes that some courts, including the Supreme Court of Ohio, have sidestepped the waiver issue. The State cites *State v. Martin*, 2018-Ohio-3226, ¶ 2.

{¶ 43} Upon review of Ohio law, some courts are split on the issue of whether an offender waives all nonjurisdictional errors which allegedly occurred in the juvenile court after the case is transferred to the general division if the offender enters a guilty plea to a felony offense. *See Powell*, at ¶ 55 and *Zarlengo*, at ¶ 37, for the proposition that an offender bound over to the general division cannot assert any nonjurisdictional errors with the bindover after pleading guilty; *State v. Jordan*, 2023-Ohio-311, ¶ 7 (8th Dist.), where the offender, after a discretionary bindover and guilty plea, challenged on appeal the amenability finding; *State v. Pickens*, 2024-Ohio-951, ¶ 14, 19 (8th Dist.), where the State argued an offender bound over to the adult court cannot appeal nonjurisdictional errors as to the bindover after pleading guilty, but the court rejected the State's effort to seek "a definitive, bright-line rule that an offender waives all nonjurisdictional errors in

15.

the juvenile proceedings after the case is transferred to the general division if the offender pleads guilty to the felony offenses," and the court concluded it "need not reach that broad of a conclusion" in resolving that case. *Id.* at ¶ 19; and *State v. D.T.*, 2024-Ohio-4482, ¶ 79 (8th Dist.), where the court ruled "[w]e do not believe a defendant must choose to go to trial, rather than enter a guilty plea, in order to preserve his . . . right to challenge errors in the juvenile court's handling of competency issues or its amenability determination." The *D.T.* court considered that "[t]he Ohio Supreme Court has held that a defendant may not immediately appeal a juvenile court's order transferring jurisdiction of his or her case to adult court but must wait to appeal any error stemming from the order until it becomes a final judgment, following conviction and sentencing, in the general division. *See In re D.H.*, 2018-Ohio-17, ¶ 1, 22[;] *In re Becker*, 39 Ohio St.2d 84, . . . syllabus. *See Smith v. May*, 2020-Ohio-61, ¶ 29 . . . ('Juveniles facing bindover to an adult court maintain the right to object to a juvenile court's noncompliance with bindover procedures and the right to appeal from any error in the ordinary course of law.')[.]" *Id.*

{¶ 44} Based on the foregoing case law, we decline to find that Coleman's guilty plea in the general division precludes us from reviewing his assigned error challenging the juvenile court's amenability finding.

**Amenability Finding**

Juvenile Law

{¶ 45} R.C. 2152.10(B) provides in pertinent part:

. . . [I]f a child is fourteen years of age or older at the time of the act charged and if the child is charged with an act that would be a felony if

committed by an adult, the child is eligible for discretionary transfer, and for transfer of the child's case, to the appropriate court for criminal prosecution.  In determining whether to transfer the child for criminal prosecution, the juvenile court shall follow the procedures in section 2152.12 of the Revised Code.

R.C. 2152.12 states in relevant part:

. . .

(B) . . . [A]fter a complaint has been filed alleging that a child is a delinquent child by reason of committing one or more acts that would be an offense if committed by an adult and if any of those acts would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following with respect to an act charged that would be a felony:

(1) The child was fourteen years of age or older at the time of the act charged.

(2) There is probable cause to believe that the child committed the act charged.

(3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record shall indicate the specific factors that were applicable and that the court weighed.

(C) Before considering a transfer under division (B) of this section, the juvenile court shall order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination.  The investigation shall be completed and a report on the investigation shall be submitted to the court as soon as possible but not more than forty-five calendar days after the court orders the investigation[.]

(D) In considering whether to transfer a child under division (B) of this section based on an act charged that would be a felony if committed by an adult, the juvenile court shall consider the following relevant factors, and any other relevant factors, in favor of a transfer under that division:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

(E) In considering whether to transfer a child under division (B) of this section based on an act charged that would be a felony if committed by an adult, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety[.]

{¶ 46} "The [foregoing] statutory scheme does not dictate how much weight must

be afforded to any specific factor and, instead, rests the ultimate decision in the discretion

of the juvenile court." *State v. Morgan*, 2014-Ohio-5661, ¶ 37 (10th Dist.). Nonetheless, "[g]enerally the greater the culpability of the offense, the less amenable will the juvenile be to rehabilitation." *State v. Watson*, 47 Ohio St.3d 93, 96 (1989).

Standard of Review

{¶ 47} A juvenile court's decision regarding whether it should retain or relinquish jurisdiction over a juvenile will not be reversed on appeal absent an abuse of discretion. *State v. Cunningham*, 2022-Ohio-3497, ¶ 58 (6th Dist.). An abuse of discretion means the juvenile court's decision was unreasonable, arbitrary, or unconscionable. *Id.*, citing *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996). So long as the juvenile court considers the appropriate statutory factors and there is a rational basis in the record to support the findings of the court in its application of those factors, the juvenile court's decision to retain or relinquish jurisdiction will be upheld. *Cunningham*, at ¶ 58.

Our Conclusions

{¶ 48} As noted above, the juvenile court set forth in its judgment entry the factors it considered in reaching its decision to transfer Coleman's case. In addition, when announcing its decision to grant the State's motion to transfer the case to the adult division, the juvenile court stated that it considered the R.C. 2151.12(D) factors in favor of transfer and found the facts showed that Coleman caused the death of the victim, he engaged in unsafe behavior involving guns, he has been affiliated with a gang, he failed to attend school regularly for two years and when he went to school he had behavioral issues including fighting and failing to follow instructions which led to suspensions. The

19.

juvenile court stated it considered the R.C. 2151.12(E) factors against transferring Coleman's case, as well as the following factors: according to Dr. Neer, Coleman had PTSD symptoms and a cannabis disorder; Coleman met regularly with a church person; Coleman would like to address behavior change; and Coleman wanted to finish high school and get a job.

{¶ 49} Upon review, we find that the juvenile court found, in accordance with R.C. 2152.12(B), that Coleman was 15 years of age at the time of the act charged and there was probable cause to believe that Coleman committed the act charged. We further find the record indicates the applicable factors which the juvenile court considered and weighed in reaching its determination that Coleman was not amenable to rehabilitation in the juvenile system, and the safety of the community may require that he be subjected to adult sanctions.

{¶ 50} Although Coleman argues the juvenile court failed to provide sound reasons as to why it could not rehabilitate him, we disagree. With respect to amenability, Dr. Neer testified that he believed Coleman would benefit from treatment, in the juvenile system or adult system, but the doctor would not say that he had the opinion that Coleman should *stay* in the juvenile system. We find that based on the record, including the evidence and testimony presented at the probable cause and amenability hearings, and in light of the seriousness of the underlying offense, the juvenile court's finding that Coleman was not amenable to rehabilitation within the juvenile system was not unreasonable, arbitrary, or unconscionable. Thus, the juvenile court did not abuse its

20.

discretion when it granted the State's motion to transfer, as the juvenile court adequately considered the entire record and analyzed the evidence as to the factors in favor of and against the transfer of jurisdiction. Accordingly, we find Coleman's assignment of error not well-taken.

{¶ 51} For the reasons set forth above, the August 1, 2023 amenability determination of the Lucas County Court of Common Pleas, Juvenile Division, and the January 12, 2024 judgment of the general division, are affirmed. Coleman is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.            _____
                                            JUDGE
Myron C. Duhart, J.

Charles E. Sulek, P.J.           _____
CONCUR.                                     JUDGE

                                 _____
                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.